Carris v. Carris.

---

## CARRIS v. CARRIS.

1. The Court of Chancery, under its general power to annul fraudulent contracts, in the absence of ecclesiastical courts, and of any provision in the constitution for a different tribunal with requisite authority, has power to annul a contract of marriage for sufficient fraud.

2. A fraudulent concealment of pregnancy at the time of marriage, when the husband had had no connection with his wife, and was ignorant of her unchastity, and a child was born within two and a half months after the marriage, is such fraud as will entitle the husband to a decree of nullity of marriage, where he has not acquiesced, but left his wife as soon as the fraud was discovered.

Carris *v.* Carris.

3. Neither ante-nuptial incontinence, nor the mere mistake of a husband as to the paternity of a child born after marriage, but begotten before by another, when he has himself been guilty of criminal lewdness towards his wife before marriage, nor false representations in regard to family, fortune, or external condition, are sufficient to avoid the marriage contract.

This was an appeal from a decree of Chancellor Zabriskie, made at May Term, 1872. No opinion was delivered.

*Mr. C. L. C. Gifford,* for appellant.

The opinion of the court was delivered by

BEDLE, J.

The object of this bill is to annul a marriage between these parties on the ground of fraud. The case shows that they were married November 12th, 1871, and that about two and a half months after the marriage, the wife was delivered of a full grown child, of which the husband was not the father; also, that he had no knowledge or information that she was with child till its birth; that he had not had any connection with her previous to the marriage, and that by reason of her artifice in her mode of dress and conduct, he, a very young man, was deceived and defrauded as to her condition.

The testimony of the complainant is sufficiently supported to justify these conclusions. The complainant left his wife as soon as her condition was discovered. A decree was refused for the reason, " that such want of chastity and concealment are no ground of divorce;" the case having been likened by the Chancellor, as it seems to me, to one merely of ante-nuptial incontinence. Ante-nuptial incontinence is, undoubtedly, insufficient to annul a marriage, but this case goes farther than that, and rests not only there, but upon the fact of pregnancy and a fraudulent concealment at the time of the marriage.

Has the Court of Chancery, then, for this cause, jurisdiction to annul the marriage?

I am not aware of any case in this state that will throw any light on that question, and the reason is, that previous to

the present constitution the marriage relation was dissolved by the legislature, when causes existed outside of those mentioned in the statute. Since the adoption of the constitution of 1844, providing that " no divorce shall be granted by the legislature," the question has become important, whether the Court of Chancery of this state has any jurisdiction to declare a marriage void, or to dissolve it for causes antecedent to it, except the two mentioned in the statute, which are, where another husband or wife is living at the time of the second marriage, and also where the parties are within the prohibited degrees. If the jurisdiction of the court is purely statutory, then there is no power in this state to declare the marriage of a lunatic, idiot, or infant, void. Such a marriage it is true, might be treated collaterally as void, but without the power stated, the ceremony that may have been performed in such a case could not be set aside by direct judicial action. And so in case of consent extorted by duress, where there may be a color of marriage, yet lacking the element of consent which is necessary in every marriage. Cases of this character necessarily call for the existence of an adequate jurisdiction in every well organized and enlightened government, and it can hardly be supposed that our existing system of courts is impotent to furnish it. The doubt arises from the fact that no such jurisdiction was exercised by the English Court of Chancery, and that it was exercised by the ecclesiastical courts alone. Practically speaking, therefore, that jurisdiction was exclusive of the Court of Chancery, and for that reason there is a want of adjudication as to the dormant powers of this latter court.

The report of an anonymous case in 2d *Shower* (*Case* 269), shows that during the times of the English Revolution they sued for alimony in chancery. Alimony was peculiarly a subject of ecclesiastical jurisdiction. The language of the report is this : " In the late times they sued for alimony in chancery, and the judges were then of opinion, that there being no spiritual courts nor civil law, the chancery had the jurisdiction in those days ; but now we have courts christian,

the chancery will allow of demurrers for such bills for alimony." This would seem to indicate that there were latent powers in that court, not exercised by reason of the existence of other courts peculiarly adapted to those matters. And, in South Carolina, the Court of Chancery, without the aid of a statute, assumed jurisdiction upon the same subject. *Jelineau* v. *Jelineau*, 2 *Dess.* 45. This shows the adaptability of that court to supply a remedy within the scope of its general jurisdiction, where none is otherwise provided. The late Chancellor, in the case of *McClurg* v. *Terry*, 6 *C. E. Green* 226, believed, from the nature of the Court of Chancery, and the present character of our constitution, and of the courts established under it, that the power must necessarily exist to declare a ceremony of marriage void, where neither party in earnest consented to it, and accordingly declared the same a nullity. That case holds the existence of such a jurisdiction, apart from the statute. To my mind, that decision is founded in sound law, and the principle of it would undoubtedly include all the cases of lunacy, idiocy and duress already instanced. The following cases recognize such a jurisdiction as inherent in a court of equity : *Wightman* v. *Wightman*, 4 *Johns. Ch.* 343 ; *Ferlat* v. *Gojon*, *Hopk.* 478 ; *Aymar* v. *Roff*, 3 *Johns. Ch.* 49 ; *Clark* v. *Field*, 13 *Vt.* 460.

The effect of lunacy, idiocy, infancy and fraud, upon contracts, and declaring void the same when so affected, are well settled matters of equity jurisdiction, and unless there is something so peculiar in the marriage contract, as to except it from the scope of such jurisdiction, there is no reason why it should not be exercised. Marriage is regarded in our law, although peculiar in its nature, and subject to many considerations of public policy, and having much of religious sanction about it, as a civil contract. Under our political system it can only be looked at in its civil aspect. As a civil contract, the common law holds, among other essentials, that consent is necessary to its validity, and there is no difference in that respect, whether the adjudication is made by the ecclesiastical courts or the courts of common law in England.

In England, the ecclesiastical courts were a part of the religious establishment of the government, and had jurisdiction over the marriage relation, as well in reference to the mere civil or common law features of it, as to its religious. Such a religious establishment being inimical to our institutions, the policy of our laws has been to distribute among the common law and equity courts, or special tribunals adopted or constituted for the purpose, as in the case of the Prerogative and Orphans Courts, all the powers of the ecclesiastical courts which are necessary and proper for the protection and enforcement of civil rights. Whenever, then, it is necessary to secure a civil right, or to be redressed for civil wrongs, we naturally expect the proper jurisdiction to be found amongst the existing courts, even if those rights or wrongs were subjects of ecclesiastical jurisdiction. The mere fact that the marriage relation was always annulled in England by the courts christian, apart from an act of parliament, ought not in itself, when the case is not canonical merely, but founded on a common law right, to be sufficient to exclude judicial action, where no such courts exist, when an appropriate jurisdiction is found in another tribunal.

Our constitution was framed on the idea that the legislative, executive and judicial departments of the government should be entirely distinct, and that *all judicial power* should be vested in the then existing courts, and such inferior courts as might be afterwards established.

The dissolution of the marriage contract for antecedent causes was by judicial action ; the aid of parliament being sought only to dissolve for causes subsequent to the marriage, and then, as a rule, only after the ecclesiastical courts had separated the parties *a mensa et thoro*. Those courts had no power to dissolve for subsequent causes, not even adultery, but for antecedent causes they could annul the marriage. Such action was purely judicial. So far then as that was based upon causes affecting the essentials of the marriage as recognized by the English common law, and divested of mere canonical considerations, to that extent the jurisdiction

Carris *v.* Carris.

of those courts should be regarded as lodged in our Court of Chancery under its appropriate powers, where the subjects are fitting. This view, I think, must necessarily result from the character of our constitution, for in its very frame work there seems to be a necessary implication, that when the legislature was prohibited from granting a divorce and no substituted jurisdiction was specially provided, the existing tribunals were sufficient to secure the integrity of the marriage contract. It may be said that the structure of part of our act of divorce is such as to give encouragement to the idea that the jurisdiction of the Court of Chancery in the respect in question was purely statutory, for the first section provides that "the Court of Chancery shall have jurisdiction of all causes of divorce, and of alimony or maintenance, by this bill directed and allowed." The original act was passed in 1794, and I suppose that previous to that time the legislature, both colonial and state, did the whole business of divorcing. But that is not conclusive on the question before us, for no judicial tribunal in England could divorce absolutely for causes subsequent to the marriage, and without legislation our Court of Chancery clearly has no such power. So far then as adultery and desertion are concerned, our act was an enabling act. That consideration alone would explain the use of the general language stated, although some causes of divorce are mentioned upon which the court might perhaps act without it.

The jurisdiction sought in this case is to annul for fraud, for fraud in the consent, and is akin to that in a case of lunacy, idiocy, or infancy, for these latter all have to do with the consent. Fraud is a well recognized subject of equity jurisdiction; the cause, speaking generally, is appropriate to an equity tribunal. The character of the relief sought is the annulling of the contract, and that also is a well settled equity power; and unless the action of the Court of Chancery can be invoked upon the contract itself, where consent is wanting, whether for idiocy, lunacy, want of age, or fraud, the strange result would follow, that such contracts could only

be attacked collaterally, and no way provided among an enlightened people, to relieve from the embarrassment and mischiefs of the illegal contract, by blotting it out. Speaking generally then, the jurisdiction of our Court of Chancery to annul fraudulent contracts is sufficient to include the contract of marriage, and although a new application of it, I see nothing in the nature of the marriage relation, as viewed by our law, to prevent its exercise. The absence of ecclesiastical courts, the existence in the Court of Chancery of the general jurisdiction stated, and there being no provision in the constitution for a different tribunal, and consent being a common law essential to the marriage contract, all shew that that jurisdiction must embrace the right to annul such a contract for a sufficient fraud. Apart from the implication in our constitution and our system of courts, such is the opinion, in result, of learned writers, and is in accordance with respectable adjudication made without the aid of any statute conferring jurisdiction. 2 *Kent* 76, 77 ; *Reeves Dom. Rel.* 207 ; Wightman *v.* Wightman, Ferlat *v.* Gojon, Clark *v.* Field, already cited.

No satisfactory light can be gathered on this subject from the history of acts in some states, in terms giving jurisdiction for fraud. Some of them may have been passed to quiet doubts upon the question, and some under the legislative belief of their necessity. But however that may be, it is a new question in this state, which must be met on principle, and decided accordingly.

The remaining part of the question under consideration, is in reference to the sufficiency of the fraud. This is a delicate question, for the relation is peculiar, and not like other contracts, which may be dissolved by the mere act of the parties. Most serious considerations of public policy and good morals affect it, and demand that it should be indissoluble, except for the gravest causes. The mere presence of fraud in the contract, is not sufficient to dissolve it. The fraud must exist alone in the common law essentials of it, and then not to have the effect of avoiding it against sound

Carris *v.* Carris.

considerations of public policy. As already stated, ante-nuptial incontinence merely, though fraudulent, is not suffi-cient. Neither is the mere mistake of the husband, as to the paternity of a child born after marriage, but begotten before by another, where he himself had been guilty of criminal lewdness towards his wife before marriage, sufficient. Neither are false representations in regard to family, fortune, or external condition, sufficient. In granting relief, courts should always be careful that no violence is done to the nature of the relation and to sound morals. It must be extraordinary fraud alone, that will justify an avoidance of the bond. The fraud charged in this case is extraordinary, peculiar, and of the most flagrant character, entering into the very essence of the contract, and if allowed to succeed, either compelling the husband to disown the child for his own protection, or imposing upon him the necessity of recog-nizing and maintaining the fruit of his wife's defilement by another, and having it partake of his inheritance. In either event, shame and entire alienation are the inevitable consequences. Surely, there can be no good policy in such action as will either compel parties to live together under these circumstances, having only the shadow of marriage, or compel them, as would be more likely, to live totally sepa-rate, a continual annoyance to each other, and a source of the greatest unhappiness. If the contract is repudiated as soon as the fraud is discovered, so that there is no acquies-cence in it, good morals and the protection of the integrity of the marriage relation require that an innocent man should be relieved from so great a fraud.

The general principle of the law is, that fraud in a mate-rial part, vitiates a contract, and the only reason why it does not apply with full force to the marriage contract is, that marriage is *sui generis* in many respects, and should not be vitiated even if fraudulent, when against " good policy, sound morality, and the peculiar nature of the relation." To be free from that restriction, the fraud must be of an extreme kind, and in an essential of the contract. In addition to the

considerations stated, the character of the fraud in this case, and its effect upon the contract, are well described by Bigelow, C. J., in an analogous case, *Reynolds* v. *Reynolds*, 3 *Allen* 609. That jurist, after remarking upon the insufficiency of mere incontinence before marriage, to declare it void, and why, says : " But a very different question arises, where, as in the case at bar, a marriage is contracted and consummated on the faith of a representation that the woman is chaste and virtuous, and it is afterwards ascertained, not only that this statement was false, but that she was, at the time of making it, and when she entered into the marriage relation, pregnant with child by a man other than her husband. The material distinction between such a case and a misrepresentation as to the previous chastity of a woman, is obvious and palpable. The latter relates only to her conduct and character prior to the contract, while the former touches directly her actual present condition, and her fitness to execute the marriage contract, and take on herself the duties of a chaste and faithful wife. It is not going too far to say that a woman who has not only submitted to the embraces of another man, but who also bears in her womb the fruit of such illicit intercourse, has during the period of her gestation, incapacitated herself from making and executing a valid contract of marriage with a man who takes her as his wife in ignorance of her condition, and on the faith of representations . that she is chaste and virtuous. In such a case, the concealment and false statement go directly to the essentials of the marriage contract, and operate as a fraud of the gravest character, on him with whom she enters into that relation. One of the leading and most important objects of the institution of marriage under our laws is the procreation of children, who shall with certainty be known by their parents as the pure offspring of their union. A husband has a right to require that his wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. Therefore a woman who is incapable of bearing a

child to her husband at the time of her marriage, by reason of her pregnancy by another man, is unable to perform an important part of the contract into which she enters; and any representation which leads to the belief that she is in a marriageable condition, is a false statement of a fact material to this contract, and on well settled principles affords good ground for setting it aside and declaring the marriage void." I have quoted thus at length, because it is the judgment of a highly respectable court, on the essential character of the fraud, and what should be its effect on the marriage relation. When that case was decided, there existed in Massachusetts a statute for the court "to grant a divorce where a marriage *is supposed to be void,* or the validity thereof is doubted, on the ground of fraud;" but it designated no particular fraud that would avoid the contract, and left it to the court to determine, upon principle, the kind. The statute has reference only to the technical jurisdiction, assuming in principle that fraud would avoid. To my mind, that case declares the true doctrine, and the opinion shows that the result was carefully reached, and with proper caution against the encouragement of any lax notions of the marriage tie. No danger resulted from that decision, as appear from two later cases—one, *Foss* v. *Foss*, 12 *Allen* 27, in which a decree was refused where a man married a woman with whom he previously had connection, and of whose pregnancy he was aware, he being assured by her that the child was his, but which turned out to be another's; the other, *Crehore* v. *Crehore*, 97 *Mass.* 330, where the husband became acquainted with a woman, and soon after had intercourse with her before marriage, when she stated she was then with child, but the next morning on being told that he would not marry her if so, she said it was only nonsense, and not true. He married her, but was refused relief because he had knowledge of her unchastity, and was put on his guard.

The same principle contained in Reynolds v. Reynolds, is sustained in the case of *Baker* v. *Baker*, 13 *Cal.* 87, opinion by Field, J., afterwards and now Justice of the Supreme

Court of the United States. That also was an analogous case to this. There was also a statute in California in regard to jurisdiction for fraud, but without indicating the character. In this country, the weight of adjudication is in favor of dissolving the marriage for fraud like this. In England, I find no case directly in point, yet the power of the ecclesiastical courts to annul for fraud in obtaining consent, is well settled, as will be seen by the following references and cases : *Rogers' Ec. Law,* 564 ; *Dalrymple* v. *Dalrymple,* 2 *Cons. Rep.* 54, 104 ; *Sullivan* v. *Sullivan,* 2 *Ibid.* 238, 246 ; *Portsmouth* v. *Portsmouth,* 1 *Hagg.* 355 ; *Hanford* v. *Morris,* 2 *Cons. Rep.* 423 ; *Hull* v. *Hull,* 15 *Jur.* 710 (5 *E. L. & E.* 589).

The apparent absence of direct adjudication on the point, may perhaps be accounted for by the meagre character of the reports previous to 1809, when Phillimore's reports commence. (*Bishop on M. & D.,* § 13). At any rate, there is no indication in the text books against it, and if fraud, under any circumstances where the forms of consent have been gone through, is to be allowed as a ground of dissolution, it should, upon principle, be in this case. There ought always to be an indisposition in every court to weaken the force and sacredness of the marriage tie. That consideration should induce great carefulness, but should not deter us from advancing where principle leads us, although before, in our courts the objective point has not been attained. The fraud in this case was so gross and far-reaching, as to avoid the consent, and for that reason the marriage must be declared null and void, *ab initio.* The decree being otherwise is reversed, and the record remitted for the Chancellor to decree according to this opinion.

VAN SYCKEL, J., dissenting.

The parties in this case were married on the 12th day of September, 1871, and in the following January the defendant gave birth to a child. The husband filed his bill for a divorce on the ground that he was not the father of the child, and did not know, at the time of the marriage cere-

Carris *v.* Carris.

mony, that his wife was pregnant. The Chancellor refused the divorce, and an appeal was taken to this court.

The power to grant divorces in this state is lodged exclusively in the Court of Chancery, and this branch of its jurisdiction is exercised, not by reason of any inherent power existing in the court over this subject as one of its general equity powers, but solely by virtue of express legislative authority.

The act of 1794 (*Pat. Laws,* 143,) gave to the Court of Chancery jurisdiction of " all causes of divorce," but added, as the act now in force does, " by this act directed and allowed." *Nix. Dig.* 246, Title *Divorce.*

The causes of divorce from the bond of matrimony specified in the act of 1794, are:

1st. Where the parties are within the prohibited degrees.

2d. Adultery.

3d. Willful and continued desertion for seven years.

4th. Where either of the parties had another husband or wife living at the time of the marriage; and

Lastly, A divorce from bed and board for extreme cruelty.

By the revision of 1846 the chancery powers in respect to the grounds for divorce are in no respect amplified. Unless, therefore, it can be shown that the Court of Chancery as constituted in this state, has a general or limited power over the question of divorce, independent of any statutory enactment, the appellant is remediless. Our court of equity has the same jurisdiction as the English chancery, with such addition as is made to it by positive law. In England, the Court of Chancery never extended its jurisdiction to the subject of divorce, but left the power to dissolve the marital relation to be administered exclusively by the ecclesiastical courts. The law matrimonial, so far as it obtains in this state, must lie dormant and inoperative until some court is constituted to apply it. We have as yet no judicature possessing the general power of the spiritual courts of England over this domestic relation.

But it is insisted that the jurisdiction of equity over fraud-

ulent contracts is sufficiently comprehensive to include the contract of marriage. I think no case can be found in England where the Court of Chancery dissolved the marriage contract, and that here to act outside of the specified cases would be not only a clear extension of equity power, but would be in contravention of the correct interpretation of our statute. According to the correct rule of statutory construction, as well the divorce act of 1794 as our present law, must be held to limit the causes of separation to those enumerated, and not to enlarge them.

The language is, that the Court of Chancery shall have jurisdiction of all causes of divorce by this bill directed and allowed. *Expressio unius, exclusio alterius.* This is a positive rule of construction, and the statute must, in this case, be a prohibition to us, unless it can be shown, either that at the time of its adoption it was the settled practice of the Court of Chancery to grant divorces in cases of fraud, or that the power to grant such divorces was fully acknowledged. Neither of these conditions to which this rule of interpretation may yield, can be shown to exist. From the passage of the act of 1794 to the present time, no one has attempted to invoke any such authority as is claimed here. This fact shows the settled conviction of our bar, which has always been learned and astute in pursuing remedies to their utmost limit.

In England, the Court of Chancery never exercised any power over this subject; the entire control over it being in the spiritual courts, until the act of 20 and 21 *Vict.* 85, which went into operation in 1858, transferred it to a new court, styled " The Court for Divorce and Matrimonial Causes ;" and no case can be found in this country where, in the absence of an express statute authorizing it, a divorce, in the proper sense of that term, has been granted for fraud. The cases referred to do not establish a contrary doctrine.

In *Aymar* v. *Roff*, 3 *Johns. Ch.* 49, where the marriage was entered into by an infant twelve years of age, in jest,

Chancellor Kent did not declare it null, but made an order prohibiting all intercourse between the parties.

In the subsequent case of *Wightman* v. *Wightman*, 4 *Johns. Ch.* 343, the same learned judge declared the marriage of a lunatic null and void.

These cases were followed by Chancellor Zabriskie, in *McClurg* v. *Terry*, 6 *C. E. Green* 225, in which a marriage ceremony performed in jest, was declared to be a nullity.

These were all cases of a pretended marriage contract, not voidable, but absolutely void. In neither case, was there any contract at all, but an entire absence of the consent necessary to consummate every contract. There was no marriage to be dissolved, nor was any decree of dissolution pronounced. The divorce power was not invoked or exercised in these cases, and they cannot be relied upon as authority to dissolve an actually existing relation, for some cause which does not make it absolutely void, but merely voidable.

All that Chancellor Zabriskie says, in McClurg *v.* Terry, and all he intends to say is, that where the contract is absolutely void by reason of fraud or force, he can declare it null.

It is important to draw sharply the distinction between void and voidable marriages. " A marriage is void when it is good for no legal purpose, and its invalidity may be maintained in any proceeding, in any court, between any parties, whether in the lifetime, or after the death of the supposed husband or wife, and whether the question arises directly or collaterally." 1 *Bishop,* § 46.

In these cases, either party could marry without being amenable to any penal consequences, before proceeding to annul the prior pretended marriage. But a marriage merely voidable, is good for all purposes until it is dissolved by a competent tribunal ; and if either party should die pending the suit, and before decree, the relation would be indissoluble, and all the property rights which flow from it could be maintained by the survivor.

The cases referred to are all void marriages, and equity,

under its inherent power over frauds, could declare that there had never been a contract, as well as it could declare void a forged deed which had been put upon the record, without at all encroaching on the domain of divorce. In the case of a sham marriage, it is a fraud in either party, or in any third person, to set it up as valid and binding.

If A, by personating B, should induce a clergyman to give him a certificate that B was lawfully joined in wedlock to C, it would not be doubted that our Court of Chancery could pronounce the supposed marriage void, without arrogating to itself the divorce power. These are in no proper sense decrees of divorce; they are merely declaratory that a marriage in fact has never had existence, and, consequently, there can be no such thing as a divorce in such cases.

In *Ferlat* v. *Gojon, Hopkins Ch.* 478, where the marriage was procured by abduction, terror, and fraud, Chancellor Sandford, on petition of the injured party, declared the contract to be utterly null; but he evidently regarded the marriage as to the plaintiff, to be absolutely void, and not merely voidable, and that in taking cognizance of the case, he was not at all exercising the power of divorce.

In the subsequent case of *Burtis* v. *Burtis*, reported in the same book, p. 567, he says: " In the case of Wightman *v.* Wightman, one of the parties was a lunatic, and in the recent case of Ferlat *v.* Gojon, the marriage had been procured by an atrocious fraud. These marriages were clearly void, and this court pronounced the sentence of nullity. If these two decrees are denominated divorces, they did not arrogate to this court any general power of divorce in cases not prescribed by our statute." And in this opinion Chancellor Sandford expressly dissents from the dictum of Chancellor Kent, in Wightman *v.* Wightman, that the power over matrimonial causes is necessarily cast upon the Court of Chancery, because it is not vested in any other tribunal. If this were so, our statute would be useless. In the case now before us, the the marriage is not void, but voidable. It was entered into by parties capable of contracting, and was fully

consummated by their consent. It is claimed to be voidable because of the fraudulent concealment of a fact. No decree can adjudge it to be void, without dissolving an existing bond.

The New York cases are no authority for the claim that marriages, voidable only for fraud, can be declared void by our Court of Chancery. The distinction is clearly run between void and voidable, in *Perry* v. *Perry*, 2 *Paige Ch.* 504, where the court say, that in cases of absolutely void marriages, for all substantial purposes of justice, the courts of common law and equity in England had concurrent jurisdiction with the ecclesiastical courts, and that the Court of Chancery and courts of common law always exercised the power to declare such marriages absolutely void, even in a collateral proceeding. That these cases were not intended to countenance the doctrine that a marriage, only voidable for fraud, could be dissolved by the Court of Chancery, is manifest by the case of *Burtis* v. *Burtis*, before cited, in which the ground relied upon was impotency. That it is a clear fraud in an imbecile to enter into this relation, no one will doubt. In the case in 3 *Allen* 605, the Massachusetts court held the temporary impotency of the woman to bear children to her husband, by reason of her pregnancy by another at the time of the marriage, to be the very essence of the fraud. Yet the same judge who decreed the contract null, in *Ferlat* v. *Gojon*, refused to divorce, in *Burtis* v. *Burtis*, for impotency, and this decision is affirmed in *Perry* v. *Perry*, upon the distinct ground that the marriage was not void, but voidable. The court discriminated between the two cases, in this language : " The decision of Chancellor Sandford, in *Burtis* v. *Burtis*, is entirely consistent with that of his predecessor, in *Wightman* v. *Wightman*. In one case, the marriage was absolutely void, and this court, in the exercise of its ordinary jurisdiction, had a right to remove the apparent obstruction to the wife's contracting matrimony with any other person. In the other case, there was a good marriage *de facto*, and the court very properly decided that the power to dissolve

such a marriage did not exist in this state, except by inter-
ference of the legislature."

The cases in Massachusetts, California, and the later
New York cases, and the cases in some other states, are under
a statute extending the divorce power to cases of fraud, and
are, therefore, of no authority here.

There is another stringent rule of interpretation which
must be violated in order to hold that our statute is not one
of limitation.

The insistment is that the Court of Chancery shall have
jurisdiction not only of all causes of divorce by the statute
specified, but of others not enumerated. In other words, that
the statute was designed to add the specified causes of divorce
to the cause for fraud, which it is claimed equity could, before
that, entertain. Now if it can be shown that one of the
causes specified in the statute is fraud of a particular charac-
ter, it must be held to exclude every other kind of fraud.

Prior marriage is one of the causes named in the statute,
and that it is a fraud of the most grievous character in one who
is married to induce another to enter into that relation with
him, will be admitted. The fact, therefore, that in addition
to causes not before cognizable in chancery, one cause for
fraud is specified by the statute, excludes every other kind
of fraud than the one mentioned.

But if jurisdiction is assumed on the ground that marriage
is a civil contract, and that equity has inherent jurisdiction
to vacate all contracts for fraud, where will the line be drawn?
The power to annul and dissolve this contract for fraud must
be co-extensive with the power over other contracts, in
analogy to which this power is claimed.

Bishop affirms that this is the most difficult topic of the
entire subject of marriage and divorce, and that he is not
satisfied with the views he has taken in the earlier editions of
his work. In his last edition he recasts his former chapter
on this subject, and lays down the proposition, that in reason,
whatever of fraud, of error, or duress, will vitiate any other
contract, should ordinarily be received as sufficient to destroy

and set aside this engagement, whether executed or executory, viewed as a thing separate from the consummation which follows; and he admits his inability to define what fraud, in kind and amount, should, under the cases, be deemed sufficient. The difficulty is inherent in the nature of the subject, for no court can accurately define what fraud is. There may be a variety of fraudulent acts, coupled with circumstances of conspiracy, neither of which, standing alone, would have the required force, but which, taken together, might impel the judicial mind to concede that the case was made out. Nor can any certain guide be drawn from adjudged cases in the ecclesiastical courts.

The frauds which I find have moved the spiritual courts to grant the separation, are impotency, a prior marriage, and error, where the party supposing he was joined to one person was actually united to another and different person. And it has been held that where a party obtained a divorce in the spiritual courts by fraudulently persuading the court to believe that he was impotent, and subsequently married and had children by the second wife, such second marriage would be dissolved and the children declared illegitimate. 1 *Bishop,* § 114, *note,* (4th edition.)

In *Bury's Case,* 5 *Coke* 98, such second marriage was held to be voidable only, and to be good for all purposes until annulled by a competent tribunal.

If we adopt the view that this court will be controlled by established precedents in the ecclesiastical courts, not only must we divorce for impotency, and for fraud in setting up and obtaining a divorce for alleged impotency when it did not exist, but this case must fall unless it can be shown that those courts have granted a divorce for the specific cause here relied upon. No such case, I think, can be found.

If the limitation is claimed to be in public policy, the two obvious answers are—

*First.* That jurisdiction cannot be founded upon the fact that the rule will be so applied as to promote public policy. No court can claim an ungranted power because it will be wisely used.

*Second.* That this would be a limitation upon the exercise of the power, and not upon the power itself, and is a subject upon which the judge of to-day, and his successor, have a right to differ. This doctrine, stated in plain terms, would be this, that whenever a circumstance of fraud entered into the engagement, which, in the discretion of the court, should annul the relation, the divorce would be declared, and the issue bastardized. This opens the entire field of fraud to this topic of contention.

There is another difficulty worthy of consideration, which suggests itself. The statute does not apply to these cases of fraud, and therefore residence in the state is not necessary to enable suit to be instituted. Are our courts to be thrown open to citizens of other states to agitate the many questions which must arise in this new and untried field of litigation? If the framer of our statute had supposed that our Court of Chancery had any such extended power as is now claimed for it, he would, undoubtedly, have provided for this difficulty. It is an imperfection in our law, that it does not give redress for a wrong so grievous as that set up by the complainant in this bill, but it belongs to the legislature, and not to this court, to provide the remedy.

There is another obstacle in the way of granting this divorce. It may well be doubted whether the Chancellor was satisfied, from the evidence, that the fact relied upon for the divorce was proven by testimony other than that of the complainant himself. If he had refused the divorce on this account, I should be unwilling to disturb his decree.

I am of the opinion that we have no power to grant the relief prayed for, and that the decree of the court below should be affirmed.

Decree reversed by the following vote:

For reversal—BEASLEY, C. J., BEDLE, CLEMENT, DALRIMPLE, DEPUE, SCUDDER, WALES, WOODHULL.   8.

For affirmance—DODD, VAN SYCKEL.   2.