22 N.J. Super. 114 (1952)
91 A.2d 629
CARMELLA PISCIOTTA, FALSELY NAMED CARMELLA BUCCINO, PLAINTIFF-APPELLANT,
v.
CHARLES PASQUALE BUCCINO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1952.
Decided October 21, 1952.
*115 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Benjamin M. Ratner argued the cause for plaintiff-appellant.
The opinion of the court was delivered by FRANCIS, J.C.C. (temporarily assigned).
Appellant sought an annulment of her marriage to respondent on the ground of fraud. After hearing, an adverse judgment was entered because of the insufficiency of her proof.
*116 The record discloses that both parties had been married previously; appellant was a widow and respondent divorced. Each had a child by the first marriage.
Appellant's claim, which was presented under the general equity jurisdiction of the Chancery Division of this court, is that respondent was guilty of fraud which affected an essential of the marriage. Her factual contention, as it appears on this appeal, is that some time before the ceremony she and respondent agreed that she would continue to work thereafter until certain outstanding debts of his were paid, that in the meantime sexual intercourse would be engaged in with some contraceptive device and that upon discharge of the obligations contraception would cease. Then they would have children. She alleges that subsequent to their marriage on July 14, 1951 she retained her employment and in accordance with their agreement fecundation was insured against; their earnings were pooled and at the end of five months the bills were paid. Thereafter on the night of January 23, 1952 she requested intercourse without contraception, saying that she wanted children. An argument ensued in the course of which her husband asserted that before the marriage he never intended to have children and that she should keep on working because he had no intention of supporting her and her child. And she claims that the following morning he packed his belongings and left their home.
The approach to the examination of the testimony adduced at the hearing to determine what was established in fact, must be made with an awareness of certain doctrinal guides appearing in our case law. Procreation of children has been described as "the most important object of matrimony" (Turney v. Avery, 92 N.J. Eq. 473 (Ch. 1921) and its "controlling purpose" (Raymond v. Raymond, 79 A. 430 (Ch. 1909).
The marriage contract is regarded as a triaded one, with the State as the third party, because the status achieved thereby is the foundation of our society. The public interest *117 as represented by the State, of necessity, being opposed to dissolution of the compact, the law has declared that annulment will be granted only when the fraud is of an extreme nature and goes to an essential of the marriage and where the proof thereof is clear and convincing. Rhoades v. Rhoades, 10 N.J. Super. 432 (App. Div. 1950); Lindquist v. Lindquist, 130 N.J. Eq. 11 (E. & A. 1941); Carris v. Carris, 24 N.J. Eq. 516 (E. & A. 1873); "N.J. Practice Series," (Herr on Marriage, Divorce and Separation), Sec. 946. Undoubtedly if a prospective husband or wife prior to the marriage formed a fixed determination never to have children, did not communicate that fact to the intended spouse, and then refused to engage in marital relations without contraception, fraud of the required character would exist. Bolmer v. Edsall, 90 N.J. Eq. 299 (Ch. 1919). However, in view of the conclusion we have reached on the factual problem presented, it is not necessary to pass upon any question of public policy or unclean hands arising out of an agreement to prevent procreation for a limited time after marriage.
Respondent interposed no defense at the trial. However, this did not lift the heavy burden which the appellant was required to carry in proving and corroborating her claims. Nor did it relieve the trial court of the obligation, which the appendix shows he recognized, of evaluating the proof and the credibility of the witnesses carefully in the light of the controlling principles to which reference has just been made. Cf. Hafner v. Hafner, 66 N.Y.S.2d 442, 445 (Sup. Ct. 1946).
Appellant testified that Buccino promised that they would have children after the marriage if she helped him by continuing to work until his bills were paid. She said nothing about any premarital conversation or agreement on the subject of use of contraceptives after the ceremony; nor anything about the length of time it would take through their joint efforts to satisfy the debts. Since the law recognizes that persons approaching matrimony do not always *118 discuss the question of procreation of children, it assumes that they do not intend to frustrate this important end of their union but rather that they intend to bring it to its normal fruition. As was said in Gerwitz v. Gerwitz, 66 N.Y. Supp.2d 327 (Sup. Ct. 1945):
"Implicit in the marriage contract is the representation that the parties will have normal and natural relations and that they will not do anything which will frustrate the normal and natural result of those relations. Where nothing is said prior to the marriage by a spouse on the subject of children, it is presumed that he or she intends to enter the marriage contract with all the implications, including a willingness to have children."
Her statement, therefore, is susceptible of the inference that the sexual relations would be normal and unimpeded but that she would continue to work until the bills were paid or as long as possible, if pregnancy intervened. In this connection, it appears that the bills were paid, in fact, five months after the marriage  a situation entirely consistent with the suggested inference. In any event, without conversation on the subject she acquiesced in contraception for five months. In view of the requirement for strict appraisal of the proof these considerations cast a doubt on the agreement for which she contends.
With respect to the breach of the alleged agreement Mrs. Buccino asserted that on the night of January 23, 1952, after the parties had retired and when they had the intention of engaging in marital relations, she demurred to the further use of contraception. This precipitated an argument in which her husband is said to have admitted the premarital existence of an intention never to have children and also a determination to have her keep working because he never intended to support her or her child. What happened that night after this denouement, whether he left her bed or not, does not appear. The testimony is that the next morning he packed his clothes and left.
The following morning before Buccino's departure, the time not being stated, there is said to have been further discussion *119 on the subject in the presence of her sister and girl friend, Catherine Latini. The sister and her husband lived in the same apartment with the parties, but how she happened to be present at this personal conversation does not appear. Nor is there any explanation furnished as to the presence of the girl friend in the apartment that morning. In fact, when Catherine Latini testified, she made no reference to having been there at that time. According to her testimonial assertions she was present only at one conversation supposed to have taken place three days later, on Saturday night, January 26, 1952. Here it is interesting to note that the appellant fixed the date of the vital disclosure to her as on the evening of January 23, 1952, and then described two further conversations, one the following morning and the second on Saturday night. Her sister testified about the morning discussion and said that only she and appellant were there. Then the sister said a further conversation occurred on Friday night when respondent fortuitously appeared at the apartment, and that at the end of this discussion Buccino took his clothes, a bank book, a few policies, left, and she never saw him again.
The witness, Catherine Latini, said she was at the apartment on Saturday night, January 25, 1952 (sic), at which time Mrs. Buccino and her sister were present. Although this witness and appellant spoke of Saturday night and the sister of Friday night, it is clear that they intended to talk about the same alleged incident because Miss Latini said that after the conversation Buccino "walked into the room and took some, or the rest of his clothes, a policy and a bank book" and left. How these witnesses were able to see what respondent did in the room and to know that he took a policy and a bank book with him is not demonstrated. Nor is the situation helped either by the sister's exclusion of Miss Latini from this incident or by Miss Latini's inclusion of the sister as among those present.
These two witnesses obviously were relied upon to furnish the corroboration which is essential to the maintenance of *120 the action. Aside from matters already referred to, analysis of the substance of their purported corroboration is revealing. When the sister was asked about the conversation of the morning of the separation, she said:
"He said that he didn't want to start on a family right away, because they hadn't cleared up  he was afraid; he didn't want to support my sister's daughter and his son; he just didn't want to support them."
The inescapable inference from this statement is that if the agreement was made not to have children until after the bills were paid, the time to abandon contraception had not arrived because the bills had not been satisfied. The effect of this answer was realized apparently because the next question seemed to draw the witness back into the expected path:
"Q. Did he say when he had made up his mind about that?"
Then after some admonitory words by the court presumably directed at leading:
"Q. What else did he say?
A. He said that he never had any intention of raising another child before they were married; he just did this so that she would marry him."
The attempted corroboration offered by Catherine Latini likewise invokes skepticism. According to her, on the Saturday night when Buccino walked into the house he said nothing until appellant asked if he was "coming back under my conditions." Then he asked what they were and his wife replied that she wanted to have a family and wanted to stop working. Whereupon he said: "I have no intention of having any children or for you to stop working * * *."
Appellant argues that the word "have" is a reporter's error and that it should be "had." However, the context is entirely consistent with "have" and the reporter's certificate of accuracy is attached to the original transcript.
In any event, the artificiality of this alleged conversation is obvious. We cannot look at the testimony in this kind of *121 action in a vacuum. In applying the law to the facts we must do so in the light of our own experiences with our fellow men. The law would be in a sad state if judges were required to accept uncontradicted statements of a witness in matrimonial proceedings without regard to their improbability.
Here the trial court had the opportunity of observing and listening to the witnesses and he found the evidence insufficient to establish the fraud alleged. Our own study of the cold record convinces us that the appellant failed to provide the character of proof required to sustain her action.
The judgment below is affirmed.