100 N.J. Super. 530 (1968)
242 A.2d 670
T, PLAINTIFF,
v.
M, FALSELY CALLED T., DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 11, 1968.
*531 Mr. Kenneth F. Lay, for plaintiff (Spingarn & Sachs, attorneys).
Mr. Jay Krivitzky, for defendant (Schwartz, Horowitz & Krivitzky, attorneys).
HARTMAN, J.C.C. (temporarily assigned).
This action to annul a marriage on the ground of impotence is a case of novel impression in New Jersey and, perhaps, in this country, in that the wife, while still a virgin, with an intact hymen, suffered a miscarriage during the marriage. The husband seeks the annulment, charging his wife with being physically and incurably impotent.
The question to be determined is whether a virgin wife, capable of procreation, can legally be declared to be impotent so as to warrant annulling the marriage. I have decided this question in the affirmative and will grant the husband an annulment.
The action is not contested on the merits. The wife filed an appearance seeking to be heard as to certain property rights which claims were withdrawn by her attorney at the final hearing.
*532 I am satisfied that the evidence supports the following findings of fact. The parties were married in this state on July 25, 1964. Numerous efforts at sexual intercourse proved to be abortive because of the inability of the female organ to permit penetration to the slightest degree. On one occasion the husband used force in his attempt to penetrate. This resulted in his ejaculating against the vulva, causing a "splash pregnancy".
The husband urged his wife to see a doctor. At first she refused to do so. She asked him to give her time, that she was nervous, that eventually it would work out. Although they continued to try, the situation did not change and the parties separated. At that time neither of them were aware that conception had taken place.
A few months thereafter the wife advised the husband that she was then prepared to see a doctor because she thought she was pregnant. In November, 1965, they both went to see Doctor George Massell, an obstetrician and gynecologist. The wife complained of lower abdominal cramps; she had missed a period; about two weeks before this visit to the doctor she had "spotted".
The doctor attempted to examine her pelvically by manual examination. He testified that this proved to be impossible. Two days later the doctor learned that her bleeding had progressed and he admitted her to the hospital. He again found it impossible to examine her physically but her symptoms indicated early miscarriage. In the operating room she was anaesthetized and dilated at which point it was discovered that she had an intact hymen. An incision was made into the hymen and the doctor proceeded to perform a D & C for the miscarriage.
It was the doctor's opinion that there had been no penetration by the husband beyond the hymen, and that the wife was suffering from a firm, fixed, deep-seated psychological problem. When asked how a pregnancy could occur in a woman whose hymen was intact he testified that this *533 was possible and that it was not unknown in medical science. To use his own expression, it was a "splash pregnancy".
A few months after the operation the parties attempted intercourse again with the same negative results. They then returned to Doctor Massell to seek his help in repairing the problem. The doctor recommended a gynecologist in New York who, he advised, had a great deal of experience with psycho-sexual problems. Doctor Massell had little confidence, however, that psychology or psychogenic treatment of the wife could correct her condition. He felt it was too deep-seated despite the fact that she loved her husband and still was unable to have intercourse with him. After seeing the New York gynecologist the wife was recommended to a psychiatrist; after two visits with the psychiatrist she refused further help. It was then that the husband again separated from his wife and brought this action to annul the marriage.
It was Doctor Massell's opinion that there had been no sexual contact between the parties unless it was made between the thighs or in the neighborhood of the labia. He stated that in his experience as a gynecologist it was not rare for a pregnancy to occur when there is ejaculation against the opening of the vagina.
The case was continued to permit the husband to produce additional expert testimony and to provide the court with a brief. On the continued date plaintiff produced Doctor Lawrence F. Burnett, of Newark, N.J., who specializes in obstetrics and gynecology. He holds a position as Senior, Attending in Obstetrics and Gynecology at St. Michael's Hospital in Newark and a similar position at the Presbyterian Hospital in Newark. He was recently elected Associate Chief of Staff of United Hospitals of Newark.
Doctor Burnett testified that he had read the transcript of the testimony taken at the previous hearing and had formed his opinion with regard to the subject matter in issue.
It was his opinion "that this woman is impotent." He defined impotency as the lack of ability to perform the sexual *534 act  he stressed the word "perform"  which could be absolute or relative; in women, "it is the lack of ability to allow penetration for the performance of the sexual act."
Doctor Burnett then referred to an article which appeared in the January, 1968 issue of the OB-GYNE NEWS, written by a Doctor Maurice Martin, a recognized authority in the field and a consultant in psychiatry at the Mayo Clinic, Rochester, Minnesota, entitled "Frigidity is Difficult to Treat". The article sets forth three types of problems which comprise psychological relations for frigidity or impotency. The first one is fear, either conscious fear of being hurt or fear of pregnancy. This results in the holding back of emotions. It could be unconscious fear of being hurt when involved in the sexual act. The second problem involves displaced love, either conscious love for another person, resulting in the loss of interest in the spouse, or the type of unconscious displaced love in an unresolved Oedipal situation as in the son-mother or daughter-father complex. The third problem involves a hostility, either conscious anger directed toward the spouse or unconscious hostility towards members of the opposite sex. Doctor Burnett was not able to pinpoint which of these problems, or combinations of them, were precisely applicable here.
Doctor Burnett further testified that in this case, on the occasion when the husband attempted forcibly to penetrate, that it was likely "that he gained the position of the penis against the hymen and he ejaculated. Pregnancy could have occurred at this point." He then cited from Delee Greenhill, Principles and Practice of Obstetrics, 9th ed., page 9, where, referring to copulation, this authority stated: "Copulation is not absolutely necessary if the semen is injected into the vagina or even on the introitus vulva which is the external opening to the vagina, conception may take place." (emphasis supplied). He stated that the treatise from which he was quoting was his text book in medical school and is a recognized authority. He is presently treating a patient who is seeking a church annulment for impotency due to vaginismus. It *535 is interesting to note that this patient, who is impotent so far as her husband is concerned, was raped by a third party between the time the annulment proceeding was instituted and the time of the doctor's first examination of her, and she eventually gave birth to a child, the direct result of the rape.
Doctor Burnett concluded that in our case the wife's problem is obviously a psychogenic one, due to vaginismus producing impotency, "that if such a long trial by these partners with obvious positive direction, that this would support a conclusion that this case is incurable."
The court's research has uncovered a short article written by one Arthur Stein of New York, in the Medical Journal of Record, Vol. 127, 1928, pgs. 550-551, entitled "Pregnancy with Intact Hymen". This article indicates that it has been fully established that pregnancy may occur after incomplete sexual intercourse outside of the vagina, and observed that this has happened between unmarried persons "especially in the southern part of Russia (Little Russia), where custom permits this type of intercourse out of wedlock but maidens strive to keep the hymen intact until marriage." This article cites twenty-five cases of pregnancy with intact hymen published in medical literature between 1672 and 1885, and six cases reported between 1924 and 1926. In all of these six cases, except one, a child was born; in the other there was a miscarriage. And in one of the cases where a child was born, examination after birth indicated that the hymen was still in its virginal state.
By statute in New Jersey, impotence is a ground for nullity of marriage. N.J.S. 2A: 34-1 provides for a number of grounds for nullity. Sub-paragraph c. dealing with impotency, provides as follows:
"The parties, or either of them, were at the time of marriage physically and incurably impotent, provided the party making the application shall have been ignorant of such impotency or incapability at the time of the marriage, and has not subsequently ratified the marriage."
*536 Vaginismus, physical or psychical, is a recognized cause of incurable impotency in New Jersey. D. v. C., 91 N.J. Super. 562 (Ch. 1966); Godfrey v. Shatwell, 38 N.J. Super. 501 (Ch. 1955); and, imperfect intercourse is not enough to rebut a finding of impotence. Impotency is the inability to have sexual intercourse; impotence is not sterility. Donati v. Church, 13 N.J. Super. 454 (App. Div. 1951); Kirschbaum v. Kirschbaum, 92 N.J. Eq. 7 (Ch. 1920).
Annulment of a marriage, where the parties, or either of them, were at the time of the marriage, physically or incurably impotent, may be accomplished in one of two ways. Where the impotency was known before the marriage but was not disclosed, that marriage may be annulled at the suit of the innocent party for the fraud inherent in the non-disclosure, invoking the inherent jurisdiction of the Court of Chancery to deal with fraudulent contracts. The inherent jurisdiction of the Court of Chancery to annul fraudulent contracts has been held sufficient to include a contract of marriage. Carris v. Carris, 24 N.J. Eq. 516 (E. & A. 1873); "the absence of ecclesiastical courts, the existence in the Court of Chancery of the general jurisdiction stated, and there being no provision in the Constitution for a different tribunal, and consent being a common-law essential of the marriage contract, all show that that jurisdiction must embrace the right to annul such a contract for sufficient fraud." Steerman v. Snow, 94 N.J. Eq. 9, 12 (Ch. 1922).
The second method of approaching nullity of marriage for impotence is statutory. It lies where the disability was not known at the time of the marriage; here fraud is not involved.
Impotence was at the time of the common law a canonical disability and was treated in the ecclesiastical courts where, according to Canon 1068 of the Code of Canon Law, "inability to perform the marital act was a diriment impediment, and thus invalidated the marriage." 52 Iowa Law Review 768 (1967). There were no ecclesiastical courts in New Jersey when we adopted the common law as the law of this *537 state; the only jurisdiction to annul a marriage for impotence was that which involved a fraudulent concealment of it. Relief from this type of marriage was, as I have stated, vested in the court of chancery pursuant to its inherent jurisdiction to annul contracts for fraud. This explains the dismissal of a suit to annul a marriage for impotence by Chancellor Runyon where no fraud was involved and the impotence was known after the marriage. See Anonymous, 24 N.J. Eq. 19 (Ch. 1873). The Chancellor there held that if the jurisdiction of the Court of Chancery was to be extended to include cases of this character, it was for the legislature to decide. And the legislature did so enact in the following year, 1874, incorporating into the revision of the Divorce Act a section 4 which provided for "divorce" from the bond of matrimony in such cases of impotence. Our current statute, N.J.S. 2A:34-1, subd. c, provides the relief by way of annulment.
I have not been able to find a reported opinion in this country where a dissolution of a marriage was sought because of an impotent wife, not able to copulate yet capable of procreation.
Nelson, in his work on Divorce and Annulment, citing authorities, refers to impotency as "a want of potentia copulandi, that is, inability to copulate, and, although, the inevitable result of the absence of such power will be an absence of the power of procreation, it does not include sterility, * * *" (emphasis supplied): Nelson, 2d. ed., vol. 1, sec. 8:03, p. 327; and further, at the same page: "In other words, it is an incapacity that admits of neither copulation nor procreation, * * *" (emphasis supplied). The difficulty I have with the Nelson text is that the cited cases deal with the inability to copulate; none apparently involve a wife who has the ability to procreate but not to copulate. His observation that the inevitable result of inability to copulate will be an absence of the power of procreation is not sustainable according to medical science as disclosed by the expert testimony adduced here.
*538 Bishop in his work on Marriage, Divorce and Separation (1801) devotes several sections to the subject of impotence. In sections 773-775, pages 331, 332 he reasons that if there is an ability on the part of the woman to procreate an annulment should be denied despite imperfect intercourse which, but for the conception, would normally result in granting the annulment. He puts the question in this manner: "Is the child to be made a bastard and is the woman to be held infamous? One of the chief ends of marriage has been attained." I do not believe that this 19th century reasoning is applicable today.
The begetting of children is truly an important end of marriage. Eminent commentators on canon law held the opinion that it was the chief end of marriage. Canon law should be distinguished from civil law. If the begetting of children were the chief end of marriage it should follow that our public policy would favor annulling marriages in sterility cases where the fact of sterility is unknown to the parties at the time of the marriage. But no statute in this state permits annulment in such cases. We are living in a time when the population growth is a major concern to all nations. Birth control and planned parenthood are on-going programs throughout the world. Abortion laws are being seriously debated in this country with a view towards revising old laws. Health and happiness appear to be the touchstone.
Children are no longer bastardized in this, and in many other states, by reason of the fact that the marriage of the parents is later annulled by court action. When a judgment of nullity of marriage is declared in New Jersey, children of that marriage are not thereby rendered illegitimate except in the single instance where a marriage, not a ceremonial one, is dissolved because either party had another wife or husband living at the time of the marriage. N.J.S. 2A:34-20. Another statute in New Jersey legitimatizes children born out of wedlock where the natural parents thereafter intermarry, and such children enjoy all the rights and privileges that they would enjoy had they been born after the *539 marriage. The status of such children is statutorily declared to be the same as if they were born in lawful wedlock. N.J.S.A. 9:15-1. Still another statute makes legitimate any child born of a ceremonial marriage notwithstanding the marriage be thereafter annulled or declared void. N.J.S.A. 9:15-2. Our legislature has thus declared the public policy in this state with regard to the legitimation of children. The reasons of concern expressed by Mr. Bishop as to children being bastardized would seem to have no force, in reason or logic, in present day legal thinking. Nor is it any longer valid to say that annulments of marriage result in characterizing the female as an infamous person to the world. The old scandal has lost its bite.
I have, therefore, decided that it would be unjust to hold the husband to his marriage contract. My factual reasons may be summarized as follows: (1), he was at the time of the marriage ignorant of the facts alleged; (2), his efforts to secure medical assistance for his wife were motivated by a desire to continue the marriage; (3), the blame for the failure to rectify the sexual problem may not be attributed to him; (4), his decision to disaffirm the marriage was made, and the action to annul was brought, within a reasonable time, not subject to successful attack by reason of any equitable defense of laches, whether raised by the wife (she raised no such defense) or by the court itself (I gave thought to it and found no reason to apply it); and, (5), after his decision to disaffirm, there were no further acts nor conduct between the parties to bar the action.
The wife is impotent. Judgment of nullity will be entered in favor of the husband.