116 N.J. Super. 380 (1971)
282 A.2d 432
DOLORES COSTELLO, OTHERWISE DOLORES PORZELT, PLAINTIFF,
v.
WAYNE A. PORZELT, DEFENDANT.
Superior Court of New Jersey, Chancery Division (Matrimonial).
Decided October 1, 1971.
*381 Mr. Isidore Hornstein for plaintiff (Messrs. Hornstein & Hornstein, attorneys).
*382 YOUNG, J.C.C. (temporarily assigned).
This is a suit for annulment of a marriage on the grounds that concealment of heroin addiction is a premarital fraud which goes to the essentials of the marital relation. The suit is brought under the general equity jurisdiction of the Superior Court. There does not appear to be case law in New Jersey dispositive of the issues presented.
Defendant Wayne A. Porzelt did not answer or enter an appearance and proofs were taken ex parte on August 16, 1971. The proofs satisfactorily establish that following a courtship of less than a month, plaintiff Dolores Costello, a 25-year old hitherto unmarried woman, married defendant, age 24, on February 26, 1971. Shortly thereafter plaintiff noticed strange behavior in her husband and discovered objects missing from the apartment, including sterling silverware, an expensive bedspread and an electric can opener. Prolonged absences from the apartment were explained as job-hunting, but upon investigation plaintiff learned that her husband had been at the home of a friend. Upon further investigation she found a hypodermic needle and a package of heroin behind the light in the medicine cabinet in the bathroom.
Upon retiring one night plaintiff observed needle marks on defendant's arms. He admitted his addiction, confessing that he had taken the household articles aforementioned and sold them for drugs. Plaintiff testified that she had no marital relations with her husband after that encounter early in April, her husband departing the apartment on April 11 and not having been heard from since that date. The wife testified that her suggestions that he seek treatment were rebuffed by her husband.
Plaintiff testified that if she had known that her husband was addicted to heroin at the time of the marriage she would not have entered into the union.
Corroboration was provided by plaintiff's mother, who testified to the personal property missing from her daughter's *383 apartment and the nonratification upon discovery of the addiction.
Another witness was Kenneth Calabrese, detective of the Jersey City Police Department assigned to the Narcotics Squad. This witness produced defendant's arrest record, on the basis of which he testified that defendant was a narcotic addict as of the date of his marriage to plaintiff. At the time of the hearing defendant was a fugitive.
There is inherent jurisdiction in a court of equity to annul fraudulent contracts, including a contract of marriage. Lindquist v. Lindquist, 130 N.J. Eq. 11 (E. & A. 1941); T. v. M., 100 N.J. Super. 530 (Ch. Div. 1968). The fraud may consist of an affirmative false representation or the withholding of the truth when it should be disclosed. Gruber v. Gruber, 98 N.J. Eq. 1 (Ch. 1925); Turney v. Avery, 92 N.J. Eq. 473 (Ch. 1921). Putting it another way, the suppression of truth is equivalent to the expression of falsehood.
New Jersey courts have adhered to the distinction between consummated and unconsummated marriages, granting judicial annulment in the latter when infected by fraud of any kind whatsoever that would render a contract voidable, but demanding that the fraud go to the very essence of the marriage relationship when consummation is established. The leading case is Ysern v. Horter, 91 N.J. Eq. 189 (Ch. 1920), recognized and applied in Akrep v. Akrep, 1 N.J. 268, 270 (1949); Brown v. Brown, 34 N.J. Super. 261, 265 (Ch. Div. 1954).
The issues framed by the proofs in the present case are:
1. Does the physical and mental impact of addiction to narcotics (heroin) go to the essentials of the marriage relation?
2. Where addiction to narcotics at the time of the marriage is concealed, and upon disclosure after five weeks of marriage the wife refuses to ratify same, is consummation a bar to annulment?
The decisional law of New Jersey has not defined what is meant by the "essentials" of the marital relation. In an *384 early case, Carris v. Carris, 24 N.J. Eq. 516 (E. & A. 1873), the court held that the wife's concealment of her pregnancy by another man at the time of her marriage was an extraordinary fraud which went to the "essentials" of the marriage. The court abstained from a delineation of the expression, merely stating (at 524) that "One of the leading and most important objects of the institution of marriage under our laws is the procreation of children * * *."
The absence of judicial guidelines was noted by Vice-Chancellor Stevenson in Ysern v. Horter, supra: "The Carris Case held, in effect, that the court of chancery had jurisdiction to annul a marriage on the ground of fraud in respect to the `common law essentials' of the marriage when such decree `would not be against sound consideration of public policy.'" 91 N.J. Eq. at 198. The vice-chancellor then addressed himself to the nature and quantum of fraud which would justify annulment of a consummated marriage, stating his conclusions in the following passage:
What is fraud in respect to the "essentials" of marriage, or, to use the broader term, what is "sufficient fraud," I think remains to-day the subject of ascertainment in every case brought before this court in which the complaining spouse alleges that his or her consent to a marriage was induced by the defendant's fraud. [at 198]
When the Carris court was called upon to grant an annulment because the wife had fraudulently concealed her pregnancy, there were no clear precedents which Mr. Justice Bedle could marshall in support of a decree upon such grounds. The court was cognizant of the paucity of authority, but nevertheless ordered the Chancellor, in the exercise of inherent general equity jurisdiction, to annul the marriage on the rationale in the excerpt which follows:
The apparent absence of direct adjudication on the point, may perhaps be accounted for by the meager character of the reports previous to 1809, * * *. At any rate, there is no indication in the text books against it, and if fraud, under any circumstances where *385 the forms of consent have been gone through, is to be allowed as a ground of dissolution, it should, upon principle, be in this case. There ought always to be an indisposition in every court to weaken the force and sacredness of the marriage tie. That consideration should induce great carefulness, but should not deter us from advancing where principle leads us, although before, in our courts, the objective point has not been attained. The fraud in this case was so gross and far-reaching, as to avoid the consent, and for that reason the marriage must be declared null and void, ab initio. * * * [Carris v. Carris, 24 N.J. Eq. at 526.]
The principle thus established was that "consideration should induce great carefulness, but should not deter us from advancing where principle leads us, * * *." Following that rather vague standard, New Jersey courts have granted annulments, under general equity jurisdiction, when impotence has been concealed, declaring same to constitute a fraud, Steerman v. Snow, 94 N.J. Eq. 9 (Ch. 1922); suppression of knowledge of venereal disease, Crane v. Crane, 62 N.J. Eq. 21 (Ch. 1901); suppression of the fact that a spouse was afflicted with hereditary chronic tuberculosis, notwithstanding consummation of the marriage, Davis v. Davis, 90 N.J. Eq. 158 (Ch. 1919); concealment of a fixed determination not to have children, notwithstanding consummation, Williams v. Witt, 98 N.J. Super. 1 (App. Div. 1967); concealment of pregnancy by another man, notwithstanding consummation, B. v. S., 99 N.J. Super. 429 (Ch. Div. 1968).
The cases confirm the proposition that any physical or mental condition or behavior which strikes against the central purpose of marriage, namely its sexual aspect culminating in procreation, goes to the essence of the marital relation. The law assumes that persons who enter into marriage do not intend to frustrate these important objects of the union, but rather that they intend to bring those objects to normal fruition. Cf. Pisciotta v. Buccino, 22 N.J. Super. 114, 117-118 (App. Div. 1952).
There is an ever-expanding body of medical literature in support of the thesis that addiction to narcotic drugs strikes *386 at the physical aspects of married life. Recently, Judge Consodine concluded that addiction created "an incapacity to discharge the marital duties within our definition of the statutory ground of extreme cruelty." De Meo v. De Meo, 110 N.J. Super. 179, 180 (Ch. Div. 1970). In an earlier opinion, Melia v. Melia, 94 N.J. Super. 47 (Ch. Div. 1967), Judge Consodine granted a judgment of divorce on the ground of extreme cruelty when it was shown that voluntary and continued addiction to heroin over a period of years, by a dissipator, resulted in attrition of sexual powers and refusal of intercourse. The formidable medical authorities collated by Judge Consodine are here cited:
Authorities recording objective scientific observation generally confirm the relation between drug addiction and sexual indifference and rejection which plaintiff charges. There are only individual exceptions to the findings. See Maurer and Vogel, Narcotics and Narcotic Addiction, 72 (1954) (general tendency to reduce or obliterate sexual desire); Schur, Narcotic Addition in Britain & America, 127, 128 (1962) (inhibition of the sexual function interferes seriously with normal marital relationship); Nyswander et al., The Drug Addict as a Patient, 46 (1956) (sexual difficulties invariably occur to the addict; there is a complete lack of interest in sex which frequently persists even when the addict is off drugs after a prison term of two or three years); Kron and Brown, Mainline to Nowhere  The Making of a Heroin Addict, 153 (1963) (marriage in the life of an addict  if it takes place at all  is a very transitory episode); Wilner and Kassebaum, Narcotics, 41 (1965), citing Eisenman, Fraser and Brooks, "Urinary Excretion and Plasma Levels of 17 Hydorxycortico-Steroids During a Cycle of Addiction to Morphine," 132 J. Pharmacol., Exp. Therap., 226 (1961) (observations of biochemical change in the maintained addict demonstrate that the decline in sexual drive and activity consistently reported by addicts has a definite physiologic basis); Chein, Gerard, Lee and Rosenfeld, The Road to H, 357, 358 (1964) ("with regard to effects on sexuality, the effect of the opiates is to diminish, if not do away with, sexual appetite. The addict `loses his nature'"); Brown, The Enigma of Drug Addiction, 39 (1961) (the addict is possessed of only one fervent objective  the ways and means of obtaining his next shot of heroin); Kolb, "Drug Addiction, A Study of Some Medical Cases," 20 Archives of Neurology & Psychiatry, 171, 183 (1928) (reduction or elimination of sexual desire tends to remove the opiate addict from the category of psychopathic sex offenders). [at 51-52]
*387 Moreover, unlike diseases such as tuberculosis and syphilis, which may be arrested or cured, there is no known cure for heroin addiction. That heroin addiction is rarely curable was the profession opinion of Dr. Hans Freymuth, New Jersey Division of Narcotics, in remarks to the New Jersey Judges Conference, Cherry Hill, September 8-10, 1971. The literature supports this opinion. See the year-long study by Committee on Public Health of the New York Academy of Medicine, cited by Breun "Three Faces of Dangers from Drugs," 42 N.Y. State Bar J., 612, 617 (1970); Drug Abuse: The Chemical Cop-Out, 27, a pamphlet published by the National Association of Blue Shield Plans (1969) ("* * * the end of his affair with drugs is more likely to be death, and not cure.")
Surely, equity should not condition relief in the premises upon proof of actual manifestations of the mental and physical impact of heroin addiction as documented in the medical literature. Indeed, cohabitation following knowledge of the fraudulent concealment would operate to defeat plaintiff's cause of action, inasmuch as nonratification upon disclosure is a prerequisite to the relief sought.
That drug addiction is a serious impediment to normal marital relations has been recognized by the New Jersey Legislature, as reflected in the new statute on marriage, divorce and annulment, L. 1971, c. 212, effective September 12, 1971. N.J.S.A. 2A:34-1 and 2. Voluntarily induced addiction or habituation to any narcotic drug is specifically mentioned as a cause for divorce from bond of matrimony. N.J.S.A. 2A:34-2(e).
Under the new annulment statute a judgment may be granted where the parties, or either of them, lacked capacity to marry due to want of understanding because of "the influence of intoxicants, drugs, or similar agents." N.J.S.A. 2A:34-1(d).
But more significantly, the Legislature recognized that a party may freely consent to marry under a misapprehension of fact, such as the fraudulent misrepresentation of physical *388 condition. The Legislature also recognized that it could not anticipate each and every possible fraudulent misrepresentation that may be made, and it wisely does no more than to include the phrase "or fraud as to the essentials of marriage." N.J.S.A. 2A:34-1(d). The Legislature, as if to leave no doubt on the matter, included subsection (f) providing that causes of judgments of nullity are allowable under the general equity jurisdiction of the Superior Court."
The Final Report to the Governor and the Legislature of the Divorce Law Study Commission, May 11, 1970, confirms that the legislative intent was to make no change in the general equity jurisdiction of the Superior Court as to grounds for annulment. "No attempt is made to limit such equity jurisdiction." (at 59)
The Legislature does not list concealment of venereal disease or tuberculosis, both judicially recognized instances of fraud sufficient to annual a marriage, as grounds for nullity. The legislative intent is to leave the specific grounds of annulment to the discretion of equity.
The decisional law of neighboring jurisdictions is divided on the issues presented in the instant case. The courts of New York have granted relief. See Lockwood v. Lockwood. 29 Misc.2d 114, 220 N.Y.S.2d 718 (Sup. Ct. 1961); O'Connell v. O'Connell, 201 App. Div. 338, 194 N.Y.S. 265 (App. Div. 1922). The courts of Delaware have denied relief. Husband v. Wife, 262 A.2d 656 (Super. Ct. 1970); Husband v. Wife, 257 A.2d 765 (Super. Ct. 1969).
I am satisfied that the uncontroverted proofs are of the character required by our decisional law, that is to say, the proofs are clear and convincing. Pisciotta v. Buccino, supra. I am also persuaded that concealment of narcotic addiction is not an "accidental quality" such as concealment of a criminal record, or misrepresentations of personal traits, or social and financial position.
Finally, I conclude that concealment of narcotic addiction is a fraud which goes to the essentials of the *389 marriage, and that upon disclosure after five weeks of marriage attendant upon nonratification, consummation will not bar a declaration of nullity under the general equity jurisdiction.
A judgment may be entered.