Patrick Edwin GOLDEN, Jr., Plaintiff-Appellee-Cross Appellant,

v.

KENTILE FLOORS, INC., et al., Defendants-Appellants-Cross Appellees.

No. 74–2452.

United States Court of Appeals, Fifth Circuit.

May 12, 1975.

Rehearing Denied June 13, 1975.

Taylor W. Jones, Atlanta, Ga., Irving R. Krosner, New York City, for defendants-appellants-cross appellees.

Joe T. Taylor, III, A. Orville Bracey, III, Atlanta, Ga., for plaintiff-appellee-cross appellant.

King & Spalding, Atlanta, Ga., Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for Mfg. Hanover Trust Co.

Before BELL, THORNBERRY and GEE, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal arises from a nonjury trial in which the plaintiff, Patrick Edwin Golden, Jr., obtained a judgment against the defendant, Kentile Floors, Inc., directing the latter to reinstate plaintiff into the company's "Profit-Sharing Plan for Salaried Employees," and awarding plaintiff $5,000 in penalties pursuant to

former 29 U.S.C. § 308(b).[1] Kentile appeals these portions of the judgment, and Golden cross-appeals the district court's rejection of a Sherman Act damages claim, the court's refusal to award some $58,000 in additional statutory penalties, and the denial of attorney's fees.[2] We affirm the judgment insofar as it denies relief under the antitrust laws and denies attorney's fees. We reverse and render judgment in favor of Kentile with respect to reinstatement of Golden into the profit-sharing plan and the award of statutory penalties. Consequently, it becomes unnecessary to decide whether the district court, in its discretion, may award less than $50 per day when the court has determined that a party is entitled to a penalty award under § 308(b).[3]

## I. FACTS

Although the parties vigorously debate the range of ultimate inferences that were permissibly available to the trial court, there has never been any material dispute over the basic sequence of events that led to this controversy. Plaintiff Golden secured employment with Kentile around November 1, 1949. The employment continued until December 5, 1969, at which time his resignation became final. During his tenure with Kentile, Golden advanced from "sales representative" to the position of "Southeastern Regional Sales Manager."

On January 1, 1953, Kentile established the Kentile, Inc. Profit-Sharing Plan for Salaried Employees, which Golden joined on November 20, 1953. At that time he executed a document, which provided in part as follows:

> I have read the Kentile, Inc. Profit-Sharing Plan for Salaried Employees, and the Trust Agreement thereunder, both dated as of January 1, 1953.
>
> I hereby agree to observe and be bound by all of the terms, conditions and provisions of the said Plan and Trust Agreement as a party, and I had [sic] subscribed my name to both of them.

The plaintiff gave unblemished deposition testimony that he had received a copy of the Profit-Sharing Plan and had read it and was familiar with its terms when he signed the document.

We mention several of the plan's "terms, conditions, and provisions." Since the plan's inception, questions concerning the rights of members have fallen within the jurisdiction of a Profit-Sharing Committee. This committee, since 1953, has consisted of the same five persons, three of whom are plan members and two of whom have no interest in the plan. Also since the plan's inception, investment management has been committed to the sole trusteeship of the Manufacturer's Hanover Trust Company.[4] No persons other than the mem-

1. This statute, one of the provisions of the former "Welfare and Pension Plans Disclosure Act" of 1958, 72 Stat. 997, as amended in 1962, 76 Stat. 35, was repealed effective January 1, 1975, by the "Employee Retirement Income Security Act of 1974," Pub.L. 93–406, 29 U.S.C. § 1001 et seq. Section 308(b) was generally superseded by 29 U.S.C. § 1132(c). The new statutes are not involved in this case.

2. Former 29 U.S.C. § 308(c) provided that in an action to enforce the liability described in § 308(b), see note 3, infra, the court "may in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

3. Former 29 U.S.C. § 308(b) provided:

    Any administrator of a plan [as defined, for present purposes, in § 302(a)(2) as in-

cluding "any profit-sharing plan which provides benefits at or after retirement"] who fails or refuses, upon the written request of a participant or beneficiary covered by such plan, to make publication to him within thirty days of such request, in accordance with the provisions of section 307 of this title, of a description of the plan or an annual report containing the information required by sections 305 and 306 of this title, may in the court's discretion become liable to any such participant or beneficiary making such request in the amount of $50 a day from the date of such failure or refusal.

4. The plaintiff originally named Manufacturer's Hanover as a defendant in this suit, alleging antitrust violations and breach of fiduciary duty. On the antitrust count the district court granted summary judgment in favor of Manu-

bers of the commitee, its counsel and staff, and the trustee have ever exercised power or control over the plan's assets or the rights of its members, nor have any other persons held the authority to do so. The plan has always been funded solely by Kentile, and participants have never been permitted to make contributions of their own. With respect to vesting, the plan provides that the contributions made by Kentile shall not confer any right, title, or interest upon a member until the funds are actually paid out under the committee's authority as set forth in the plan.

This dispute focuses narrowly on one of the plan's specific clauses. At all times since January 1, 1958, the plan has provided as follows:

> Article VII, Section 12(b):
>
> If the Committee determines that any Member whose employment has terminated by reason of retirement or other cause, is, without the written approval of the Employer, engaged or employed in any occupation, or in a business, which, in the Committee's sole opinion, is in competition with the Employer, and if after 5 days' notice by Registered Mail, such Member fails to discontinue such engagement or employment, the share of such Member then held by the Trustee shall be deemed forfeited upon the certification of the Committee.

Between 1953 and 1958, the plan contained essentially the same forfeiture feature, except that a member had sixty days following notice from the committee in order to avoid forfeiture by ceasing competitive employment. The 1958 amendment does not inject a material fact into this case in that if the commit-

tee's action which is presently challenged may not be disturbed, then the plaintiff necessarily forfeited his interest under either the original plan or the amendment, as he continued to work for the employer determined to be a competitor of Kentile for more than sixty days after receipt of the committee's notice by registered mail.

On November 14, 1969, plaintiff tendered his formal letter of resignation to Mr. David O'D. Kennedy, who was Kentile's president, board chairman, and a member of the Profit-Sharing Committee. In this letter the plaintiff announced that he had "joined with a small group of men to form a new carpet company, which will be called Commander Carpets. We will construct a production facility and home office in Cartersville, Georgia with plans to initially market four (4) qualities through sales agents." Plaintiff also expressed his hope that the committee, upon receipt of this news, "would not evaluate such a new company to be classified a competitor." Nonetheless, plaintiff admitted in his deposition that although he did not personally feel that he was going into competition with Kentile, he was aware on November 14, 1969 that he might be classified a competitor. One major reason for the plaintiff's decision to change jobs stands out in the record, and is not subject to serious question: he simply thought he could improve his opportunities and earn more income with the new firm. Although he had mentioned his awareness of a possible competition problem in the resignation letter, plaintiff did not then request from the committee a response thereto, nor did he request such a response during his "short" time at Kentile up to December 5.[5]

---

facturer's Hanover, *see* 344 F.Supp 807, and we affirmed at 475 F.2d 288 (1973). With respect to the count alleging breach of fiduciary duty, Manufacturer's Hanover remains involved only indirectly, in that it represented to the earlier panel that it would cooperate with Kentile in carrying out whatever judicial mandate results from the present litigation. 475 F.2d at 291.

5. By a letter dated December 17, 1969, plaintiff gave notice to the committee of his resignation and asked that the committee consider a lump-sum method of payment of amounts contributed to his account over the years by Kentile. The method of payment was a matter committed to the discretion of the committee, and the letter on its face does not indicate that plaintiff was then under the impression that a

At the time of plaintiff's resignation, Kentile was marketing floor coverings, including tufted carpeting, throughout the Southeast, and plaintiff stood in direct charge of Kentile's sales in Alabama, Florida, Georgia, Louisiana, Mississippi, the Carolinas, and Tennessee. During plaintiff's ensuing employment as vice president of Commander Carpets, he made carpet sales for Commander in Florida, Georgia, Louisiana, Mississippi, South Carolina, and Tennessee. Similarly, plaintiff made sales for Commander to several distributors who were likewise Kentile customers. He also contacted other Kentile distributors in unsuccessful attempts to sell Commander's products. The distributors contacted by plaintiff initially on behalf of Kentile, and later on behalf of Commander, customarily handled several more or less qualitatively equivalent lines of carpet. Although he denied that these distributors were purchasing carpet from Kentile similar to the carpet he sold for Commander, plaintiff admitted in his deposition that the manufacturers of various lines of carpet competed with each other for the business of the distributors. He also testified to an awareness that, to a varying degree depending on the consumer's intended use, all types of carpet are competitive with each other, and tufted carpets are sometimes competitive with other floor coverings manufactured by Kentile. This thesis was corroborated by the deposition testimony of another witness, Mr. John Shevlin, who added that "an awful lot depends on the person doing the selling job, which way he points the customer."

There is no dispute that during plaintiff's term with Commander, that company manufactured or marketed at least three types of carpet, one of which (a "70/30 acrylic level loop") was highly competitive with Kentile's "Homestake, Pattern No. 721." Further, uncontradicted deposition testimony by Mr. Shevlin indicated that at all pertinent times

Kentile had the raw materials, equipment, and manpower to manufacture and market carpeting identical to the three types produced by Commander. In essence, the plaintiff does not and cannot contradict the overwhelming evidence that he engaged in competition with Kentile while employed by Commander. Nor has he contended during this litigation that the committee's determination to that effect was factually erroneous; nor was such a finding made by the district court.

Following his letter of resignation, plaintiff received no official word from Kentile concerning his membership status in the profit-sharing plan for approximately four-and-a-half months. Then, around April 8, 1970, he received from the committee the registered letter, dated April 1, which called his attention to Article VII, Section 12(b) of the plan, *supra*, and which notified him that his share of the fund would be forfeited if he did not terminate his employment with Commander during the next five days. Despite this notice, plaintiff took no step toward terminating with Commander. Instead, he wrote a "personal" letter to Mr. Jack Clegg, a Kentile vice president, requesting that Mr. Clegg express a "sales opinion" describing Commander's activities to Miss C. W. Kelly, Kentile's executive vice president, and the committee member who signed the letter of April 1. Among other things, this letter expressed plaintiff's puzzlement and hurt feelings that the committee would view Commander as Kentile's competitor, when Commander stood comparatively as a much smaller operation, and plaintiff had rendered twenty years of service to Kentile. There is no evidence that Mr. Clegg, who was not a committee member, ever transmitted the information submitted by plaintiff to Miss Kelly or to the committee. On the other hand, plaintiff's letter to Clegg had begun: "If you prefer not to get involved in this matter, I'll understand."

---

prompt response would be forthcoming. In fact, plaintiff specifically wrote that "payment . . . as I understand it, will not be made until two full years have elapsed." Nor did

plaintiff include any language in the letter that might objectively be construed as a request for comment from the committee prior to the passage of the two year waiting period.

Apart from the letter to Clegg, there is no evidence that plaintiff made any attempt to present his case to the committee prior to receipt, on about April 20, 1970, of a copy of the committee's formal resolution of forfeiture. Although the record contains an undisputed assertion by Kentile that plaintiff "could have submitted . . . in such form that he chose, any information or evidence that he wished to have the Committee consider," once again plaintiff's unequivocal deposition testimony reflects his admission that he "made no further attempt to discuss this matter with any officer of Kentile or any member of the committee."

The final brick in the road to the courthouse was laid shortly thereafter. In a letter dated April 27, 1970, plaintiff wrote to the committee requesting some twenty-four items of detailed information about the profit-sharing plan,[6] and purportedly invoking the "federal Welfare and Pension Plan Disclosure Act." In reply correspondence dated July 10, the committee forwarded to plaintiff a copy of the minutes of its meeting of June 15, in which the committee had determined upon the advice of counsel to refuse compliance with the request for information. As the basis for this decision, the minutes recite that the committee no longer considered plaintiff a "participant" [7] in the plan as of April 27, the forfeiture having become irrevocable on April 20, the date of the forfeiture resolution.

Plaintiff Golden terminated his employment with Commander on June 23, 1970 by redeeming $500 worth of Commander stock he had purchased when he joined the company. Five months later he initiated this suit. In a commendably professional fashion which exemplified the virtues of skillful discovery under the Federal Rules of Civil Procedure, the parties submitted the case for trial upon the answers to interrogatories, depositions, and various exhibits. We turn now to the issues on appeal.

## II. THE ANTITRUST COUNT

Seeking treble damages under § 1 of the Sherman Act, 15 U.S.C. § 1, and § 4 of the Clayton Act, 15 U.S.C. § 15, plaintiff Golden launches a broadside attack on the anti-compete provision of the Kentile plan, Article VII, Section 12(b), *supra*. The district court rejected this claim in the belief that the weight of authority lies against finding unreasonable restraints on trade when the employment-generated contract restriction does not preclude the employee from engaging in competitive activity, but merely provides for the loss of rights or privileges if he does so. We believe that the district court ruled correctly, both as a matter of authority and as a matter of sound judgment under the rule of reason.[8]

Section 1 of the Sherman Act generally outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . .." Despite the statute's expansive language, we are reminded that "no court

---

**6.** In addition to items specifically encompassed within the terms "description of the plan" and "annual report," *see* former 29 U.S.C. §§ 308(b), 305, 306, plaintiff sought certain other information, including: copies of the annual reports for every year since the plan's adoption; records of amounts contributed to the plan by Kentile during every year of the plan's existence; the amount of benefits paid out during every year of the plan's existence; and an "annual accounting period" breakdown of the number of employees covered by the plan.

**7.** The minutes refer specifically to Section 3, Subdivision 6 of the former Disclosure Act, 29

U.S.C. § 302(a)(6), which defined a "participant" as "any employee or former employee of an employer or any member of an employee organization who is or may become eligible to receive a benefit of any type from an employee welfare or pension benefit plan . . .." Section 302(a)(7), which defined the term "beneficiary," conditioned that status upon designation by a "participant" or by the terms of the plan itself.

**8.** In his reply brief in this court, plaintiff expressly disclaims reliance on any *per se* theory of liability.

applying the rule of reason has ever held such a contract [i. e., of the sort involved here] violative of section 1 of the Sherman Act." Bradford v. New York Times Co., 2d Cir. 1974, 501 F.2d 51, 59.

■ Still the leading case applicable to this problem is United States v. Addyston Pipe & Steel Co., 6th Cir. 1898, 85 F. 271, aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), which foreshadowed the rule of reason later reflected in the Supreme Court's celebrated *Standard Oil*[9] and *American Tobacco*[10] duet. While we are mindful that *Addyston Pipe* established that the Sherman Act is, at the threshold, a positive Congressional restatement of the common-law's disfavor for oppressive ancillary anticompetitive covenants, we agree with the Second Circuit's observation in *Bradford* that the collective effect of the rule of reason decisions was to "effectively [overcome] any earlier intimations that all restraints of trade, whether valid or not at common law, were now literally prohibited by section 1 of the Sherman Act." 501 F.2d at 59–60. Consequently, in the absence of a *per se* challenge, we are satisfied that the issue of Article VII, Section 12(b)'s reasonableness should be resolved by reference to its business context viewed in light of prevailing common-law principles. We utilize these principles because they constitute the connecting fabric of pertinent Sherman Act analysis, and not because— as the plaintiff mistakenly suggests—we labor under some misapprehension that by reference to them we thereby bind ourselves to the law of any particular state. Though we find guidance in precedents developed for the most part under state law, our decision of this antitrust claim is in all respects a federal one. *Cf.* Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

We begin with the settled proposition, noted by the district court, that at common-law

[t]he authorities . . . generally draw a clear and obvious distinction between restraints on competitive employment in employment contracts and in pension plans. The strong weight of authority holds that forfeitures for engaging in subsequent competitive employment, included in pension retirement plans, are valid, even though unrestricted in time or geography. The reasoning behind this conclusion is that the forfeiture, unlike the restraint included in the employment contract, is not a prohibition on the employee's engaging in competitive work but is merely a denial of the right to participate in the retirement plan if he does so engage.

Rochester Corp. v. Rochester, 4th Cir. 1971, 450 F.2d 118, 122–23 (footnotes omitted) (Virginia diversity suit). See also Brown Stove Works, Inc. v. Kimsey, 1969, 119 Ga.App. 453, 167 S.E.2d 693, 695; Van Pelt v. Berefco, Inc., 1965, 60 Ill.App.2d 415, 208 N.E.2d 858, 865.

We deem it significant that this case presents as pure an example of "employee choice" as a court could normally anticipate. While the "employee choice" doctrine, *see* Kristt v. Whelan, 1957, 4 A.D.2d 195, 164 N.Y.S.2d 239, aff'd, 5 N.Y.S.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116, has to some degree been discredited by both the *Bradford* and *Rochester* courts insofar as it suggests that a forfeiture may never be examined for reasonableness, those cases involved more than simple forfeitures of unvested deferred compensation. In *Bradford* the plaintiff, a former New York Times key executive, had executed an express promise *to refrain from competition* with the Times throughout the period during which deferred benefits would be payable. The agreement provided for forfeiture of unpaid benefits as a measure of liquidated damages in case of breach. As an express covenant not to compete, upon which the Times might have sought injunctive relief as well as forfeiture, the

---

**9.** Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**10.** United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

agreement was held subject to a searching (albeit unproductive) review for unreasonableness. In *Rochester* the company had attempted unilaterally to impose an anti-compete forfeiture amendment to a pension plan under which the plaintiff's rights had already vested, by virtue of some nineteen years' service. With respect to sums accrued prior to the amendment, the court held that the company's action was unreasonable and invalid under the terms of the plan itself, which prohibited amendments that would impair the interest of any member in prior contributions. As to contributions made subsequent to the amendment, however, the *Rochester* court held that plaintiff's rights were not violated by the company's declaration of forfeiture upon his commencement of competitive employment, despite the contributions' vestiture.

None of the factual complications found in the other cases is present in the case at bar. For purposes of our decision that Article VII, Section 12(b) is not unreasonable under § 1 of the Sherman Act, it is sufficient to emphasize several considerations: First, the forfeiture provision, though clearly part of a "contract," [11] in no way prevented plaintiff from retaining or continuing employment with Commander; indeed, plaintiff continued such employment without any interference from Kentile until he resigned from Commander for reasons related not to the profit-sharing plan, but to his own economic self-interest. Second, the plan imposed no restriction on any other potential employer, nor has plaintiff shown that the forfeiture provision restrained or coerced any prospective employer from hiring him.[12] Third, the forfeiture, by the express terms of the plan, did not operate to divest a "vested" right.[13] Finally, the forfeiture provision, in the context of the entire Kentile plan, is supported by reasonable

---

**11.** Under plaintiff's theory, the parties to this "contract," for purposes of the Sherman Act, were himself and Kentile. We assume, of course, that *in pari delicto* would be disfavored as a defense, if plaintiff's claim were otherwise meritorious. *See* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Alders v. AFA Corp., S.D.Fla.1973, 353 F.Supp. 654, 656, aff'd, 5 Cir. 1974, 490 F.2d 990.

**12.** *Cf.* Graham v. Hudgins, Thompson, Ball & Assoc., Inc., N.D.Okla.1970, 319 F.Supp. 1335.

**13.** Had it done so, we might be more inclined to view the forfeiture as a liquidated damages remedy for breach of an implied covenant not to compete. As in the *Bradford* case, *supra,* the covenant itself could be examined for temporal, geographic, and economic reasonableness. Then, depending on the limitations of the covenant's reasonable scope, the damages aspect could be scrutinized in terms of whether the contractually-set forfeiture constituted an excessive tribute for the privilege of competing. An analytical thesis which distinguishes between vested and unvested interests has more than technicality to support it. In the case of forfeiture of a vested interest, the restraint upon the employee's freedom to follow a chosen vocation is more immediate, since it impacts directly upon what is, by the parties' mutual agreement, *his* property instead of the employer's or the trust's.

The only suggestion in this case that plaintiff's interest in the Kentile plan had vested prior to the forfeiture is an argumentative assertion in the statement of facts preceding his brief. Brief for Appellee-Cross Appellant at 15. The district court rendered no opinion on the matter. In any event, as a matter of construing the written terms of the plan, we have independently satisfied ourselves that plaintiff's interest remained entirely the property of the trust until the committee should direct payment. As pertinent, the plan provided thusly:

Article IV, Section 6. The fact that there shall be allocated to an account of a Member a share in the contribution made by the Employer, and the forfeitures for a particular Taxable Year, *shall not vest in any such Member any right, title, or interest in and to the Trust Fund or any share or part thereof, except at the time or times and upon the terms and conditions expressly set forth in this Plan.* (emphasis ours).

\*   \*   \*   \*   \*   \*

Article VII, Section 4. *Upon Voluntary Discontinuance of Employment.* If a Member shall voluntarily discontinue his employment with the Employer at a time more than 10 full years from the date upon which he became a Member of this Plan, his share of the Trust Fund shall become payable to him as provided in Section 9 of this Article.

\*   \*   \*   \*   \*   \*

Section 9. *Method of Payment.* A Member's share of the Trust Fund shall be paid or made available by the Trustee from the

business justifications. More specifically, the forfeiture was designed by Kentile to protect the company and other member employees against competition from former employees who leave the company, voluntarily engage in competitive employment, and yet simultaneously seek to obtain deferred compensation from a trust established and funded by Kentile for the benefit of personnel whom Kentile would reward for company loyalty and consequent company success. As a matter of permissible business practices under federal antitrust policy, there would perhaps have been limitations upon the degree to which Kentile lawfully could have restricted plaintiff's right to work in a chosen field. Contrary to plaintiff's contentions, that is not what was done. Rather, Kentile sought to insure that the plaintiff would not freely compete against it and at the same time obtain resources which the company, in its judgment, might utilize more advantageously in favor of other employees. We are unable to say that the means chosen by Kentile in furtherance of this legitimate objective were unreasonable within the proscription of § 1 of the Sherman Act and the relevant case law.[14] We therefore affirm with respect to the antitrust claim.

> Trust Fund *only upon direction of the Committee, and at the time and in the manner provided in this Section.* . . . Section 9, subsection (e): Notwithstanding anything to the contrary contained in the preceding paragraphs of this Section, *the share of a Member who voluntarily discontinues employment shall not be paid to him, in whole or in part, until at least two full years have elapsed from the date of his voluntary discontinuance of employment, or, in the Committee's sole discretion, until such Member shall have reached normal retirement age.* (emphasis ours).
>
> From these provisions it is clear that the plan operated by its express terms and the discretion conferred upon the committee to postpone both the vesting and payment of plaintiff's interest prior to the declaration of forfeiture. Contrast the plans in Rochester Corp. v. Rochester, *supra;* Siegel v. First Pennsylvania Banking & Trust Co., E.D.Pa.1961, 201 F.Supp. 664.

**14.** In an effort to avoid this result, plaintiff relies heavily on Muggill v. Reuben H. Donnel-

## III. PENSION PLAN REINSTATEMENT

This claim, arising under diversity jurisdiction and the decisional law of New York,[15] resulted below in an order enjoining Kentile "from refusing or failing to pay plaintiff his share of the Trust Fund valued in an amount of $28,701.12. . . . " Although the parties do not differ greatly over the proper legal standards, Kentile emphatically assails the trial judge's findings of fact as clearly erroneous, F.R.Civ.P. 52(a). We, too, are "left with the definite and firm conviction that a mistake has been committed," Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), and accordingly we reverse. Since we are convinced likewise that the plaintiff failed to carry his burden of producing evidence in support of his claim, we render judgment in favor of Kentile.

Recalling the provisions of the plan concerning vesting and the timing of payment,[16] it appears that the committee had no express contractual obligation to undertake a determination of plaintiff's rights within a particular time period

ley Corp., 1965, 62 Cal.2d 239, 42 Cal.Rptr. 107, 398 P.2d 147. The *Muggill* opinion by Justice Traynor, though enlightened and persuasive, is nevertheless distinguishable because there the employee's rights under a pension plan had vested by virtue of his retirement. Furthermore, *Muggill* was decided under a California statute which prohibited devices restraining persons from pursuing a chosen trade or business. In contrast, under the sweepingly-general terms of the Sherman Act we are committed by *Addyston Pipe* to the common-law.

**15.** Plaintiff is a citizen of Georgia and Kentile is a New York corporation with principal offices there. The parties are in accord on the applicability of New York substantive law under Georgia conflicts practice, inasmuch as the profit-sharing plan was prepared in New York and administered in and from New York.

**16.** See note 13, *supra.*

following his resignation from Kentile. Strictly speaking, the committee had at least two years in which to decide whether the plaintiff met the plan's entitlement conditions, including that contained in Article VII, Section 12(b). This may or may not have been plaintiff's subjective understanding of the plan,[17] but as a bare matter of interpretation we take its words as we find them in the absence of something in the plan itself, or in the circumstances surrounding its execution, to indicate a different intention of the parties. There is nothing in either respect.

■ Rather, it was plaintiff's successful contention below that the committee abused its broad discretion in the *manner* by which it determined his competitiveness, and hence the forfeiture. Courts naturally have shown great reluctance to sustain such challenges when the parties have freely agreed upon a comprehensive scheme for private resolution of deferred compensation disputes. E. g., Gomez v. Lewis, 3d Cir. 1969, 414 F.2d 1312, 1314; Menke v. Thompson, 8 Cir. 1944, 140 F.2d 786, 791; Szuch v. Lewis, D.D.C.1960, 193 F.Supp. 831, 835. *See, also* Danti v. Lewis, 1962, 114 U.S. App.D.C. 105, 312 F.2d 345–351–52 (Bazelon, C. J., dissenting). We believe this cautious approach to be not only in accord with the weight of authority, but also the better view. Although we have discovered no decision by the Court of Appeals of New York involving precisely the situation involved here, case law concerning analogous committee determinations plainly demonstrates that court's rejection of an ambitious supervisory role over the employment relationships reflected in these cases. *See* Gitelson v. Du Pont, 1966, 17 N.Y.2d 46, 268 N.Y. S.2d 11, 215 N.E.2d 336 (brokerage house employee's retirement rights terminated for "dishonesty"; employee must prove committee exceeded authority or guilty

of fraud or bad faith); Bradford v. New York Times Co., *supra*, 501 F.2d at 61. *Cf.* Matthews v. Swift & Co., 5 Cir. 1972, 465 F.2d 814, 818.

On the other hand, we have held that clauses deferring resolution to "the Committee's sole opinion," and making the committee's determination "final, binding, and conclusive,"[18] do not necessarily commit unbridled discretion to plan administrators. Marsh v. Greyhound Lines, Inc., 5th Cir. 1974, 488 F.2d 278 (Texas law). *See also* Hainline v. General Motors Corp., 6th Cir. 1971, 444 F.2d 1250 (apparently Michigan law). Despite their reluctance to interfere with private employment affairs, courts do not step completely aside when the party who would assume the role of sole arbiter is charged with fraud, bad faith, or a grossly mistaken exercise of judgment. E. g., Hurd v. Illinois Bell Tel. Co., N.D. Ill.1955, 136 F.Supp. 125, 154–55 and cases cited, aff'd, 7th Cir. 1956, 234 F.2d 942, cert. denied, Seybold v. Western Elec. Co., 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124. This was the thrust of our holding in *Marsh*, and it constitutes the standard of limited judicial review which we believe the Court of Appeals of New York would observe in this case. *See* Gitelson v. Du Pont, *supra*.

■ We turn now to whether the district court could justifiably have found fraud, bad faith, or grossly mistaken judgment by the Kentile committee on the basis of the evidence adduced below. At the outset, the court recognized the absence of any direct proof of wrongdoing. It reasoned, however, that the four and one-half month delay between plaintiff's resignation letter and the committee's warning letter of April 1, 1970 implied bad faith or a failure to exercise honest judgment. The court then concluded that in view of the time and money plaintiff had expended on behalf of Commander during that period, it

---

17. See note 5, *supra*.

18. Under Article VIII, Section 6 of the Kentile plan, the committee's decision on a matter within its authority is "final, binding, and con-

clusive upon the Employer, each Employee, Member, beneficiary and the Trustee and every other person or party interested in or concerned with this Plan or the Trust Fund."

"[could not] interpret such exercise of discretionary power to be free of 'bad faith or failure to exercise an honest judgment.' " Although the court had previously determined that constitutional procedural due process did not apply to the profit-sharing plan,[19] it then indicated that its findings of bad faith or dishonest judgment were predicated, at least in part, on the plan's absence of a formal procedure for evaluating issues of competitiveness in a speedier and more open fashion. This shortcoming added, in the court's opinion, to "an obvious implication of bad faith as well as a failure to exercise an honest judgment."

We have searched the record in vain for substantial evidence of committee misconduct during the complained-of four and one-half month period which formed the principal basis for the district court's inferences. Except for the correspondence described in Part I, *supra*, the only probative reflection of the committee's activities respecting the plaintiff during that period is a letter, dated March 31, 1970, addressed to plaintiff from Mr. Irving Krosner, the committee's counsel. In this letter Mr. Krosner apologized for the delay, explaining that plaintiff's resignation letter to Mr. Kennedy had been forwarded to him for investigation on behalf of the committee, but misfiled by a secretary. With this letter Kentile sought to establish a defense of excusable neglect, buttressing the theory with the fact that the committee met and acted immediately thereafter. We do not believe the district court erred in refusing to accord that theory conclusive weight. Krosner's letter, for one thing, failed to account for the letter of December 17, 1969, in which the plaintiff separately notified the *committee* of his resignation. On the other hand, we are unable to accept plaintiff's thesis that proof of the mere fact of delay, from which *negligence* might be fairly inferable, is logically supportive of the *mens rea* implicit in a charge of fraud or bad faith.[20] The district court plainly saw these logical difficulties, but sought to circumvent them by first assuming committee action based on "grossly mistaken criteria," and then implying bad faith or dishonest judgment from the assumption.

In our role as a reviewing court, we are compelled to take a different view of the record. In the first place, the criteria by which the committee found plaintiff to be Kentile's competitor were not put in issue. Plaintiff simply has never contended that the committee's judgment was wrong. Nor has plaintiff alleged or shown that the period afforded the committee by the plan for this determination, *i. e.*, two years more or less, resulted from overreaching or unfair bargaining.[21] If the committee could have waited at least two years before reaching a final decision on plaintiff's competitiveness, then a delay of four and one-half months, without more, was not arbitrary or unreasonable, nor did it evince fraud or bad faith. Next, plaintiff's attempt to inject an element of detrimental reliance into the case is not well taken. The record clearly reflects that plaintiff left Kentile, went to work for Commander, bought stock in that company, and absorbed business expenses because he believed such a course of action beneficial to his long-term interests. It strains credulity to suggest that plaintiff's activities on behalf of

19. This ruling was not appealed.

20. Although it appears that we are the first court to squarely so hold, other cases have refused to find misconduct on the part of plan administrators even though similar delays had occurred. These delays appeared to play no part in the courts' decisions. *See, e. g.*, Patterson v. UMW Welfare and Retirement Fund, E.D.Tenn.1971, 346 F.Supp. 11 (five months); Pavlovscak v. Lewis, W.D.Pa.1960, 190 F.Supp. 205, aff'd, 3d Cir. 1961, 295 F.2d 39 (three months); Szuch v. Lewis, D.D.C.1960, 193 F.Supp. 831 (five months). We have discovered no case in which a mere pre-denial delay has been held probative of fraud, bad faith, or grossly mistaken judgment.

21. In the absence of appropriate evidence and contentions, we need not and do not decide whether two years might be an unreasonably lengthy period.

Commander were taken in reasonable reliance on an expectation that those activities would somehow insure his receipt of Kentile benefits. Even if we assume that the plaintiff did not consider himself Kentile's competitor, that belief is of no avail to him now. Finally, if the plaintiff had made some showing that the terms and structure of the plan were unreasonable as formulated, or that the committee had failed to exercise the discretion granted to it, we would be more sympathetic to the district court's suggested revisions. In short, no such showing was made. Plaintiff complains about the committee's delegation of investigative duties to attorney Krosner, yet he makes no assertion that the delegation was forbidden or excessive under the plan's provisions. Similarly, he does not contend that the committee lacked authority to convene informally, as long as its decisions were made with the approval of its members. Under these circumstances, it is not the province of the court to superimpose new requirements upon the mechanism adopted by the parties.

We reach our decision that the district court's findings are clearly erroneous fully aware of the evidentiary problems that plaintiffs face in these cases. Out of this awareness we have held that fraud or bad faith may be proved circumstantially as well as directly, since "direct evidence of bad faith could be easily concealed in the Trust's internal procedures and the Trustees' private opinions . . .." Marsh v. Greyhound Lines, Inc., *supra*, 488 F.2d at 280. We do not deviate today from that holding. The court below, also in recognition of these problems, apparently utilized the device of a procedural presumption in order to shift to the defendant a burden of going forward with exculpatory evidence. We consider the use of such a trial tool largely a matter within the discretion of the District Judge. Carefully employed, a procedural presumption can be an effective means to "smoke out" a party with peculiar knowledge of the facts, or to further a variety of other judicial and social policies. *See* Morgan, Presumptions, 12 Wash.L.Rev. 255, 257 (1937). Nonetheless, when correctly applied in this type of common-law civil action, the presumption is procedural only. *See generally* C. McCormick, Evidence § 345, at 821 (Cleary ed. 1972). It does not shift the burden of proof unless a shift is dictated by an independent rule of law. F.R.Ev. 301, 302, eff. July 1, 1975. Thus, when the time comes to enter findings, those that are based on the presumption must still follow logically and naturally from the basic proof in the lawsuit. Here they do not; hence we reverse.

## IV. AWARD OF STATUTORY PENALTIES

In 29 U.S.C. § 308(b),[22] pursuant to which the district court entered a $5,000 judgment against Kentile, Congress entrusted the ultimate propriety of such penalty awards to the court's discretion. Congress was not silent, however, with respect to the objectives it sought to achieve. Referring to the Act as a whole, § 301(b) defined Congress' policy as a desire

> to protect interstate commerce and the interests of participants in employee welfare and pension benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto.

In a context similar to this case, it has been recognized that "the aim of the Act was narrow, that Congress intended to confine it to a disclosure and reporting function." Moyer v. Kirkpatrick, E.D. Pa.1967, 265 F.Supp. 348, 350, aff'd, 3d Cir. 1968, 387 F.2d 955.

The text of the Act and its legislative history are entirely consistent with those limited objectives. Thus, by the Act's express terms, only a "participant or beneficiary covered by such plan"[23] was

---

**22.** See note 3, *supra*.

**23.** See note 7, *supra*.

entitled to the disclosure sought by plaintiff in his April 27, 1970 letter to the Kentile committee. A few days earlier, however, the committee had formally notified the plaintiff that his share of the trust was forfeited. Nevertheless, plaintiff continued to work for Commander until June 23, 1970.

■ The sole question, then, we believe, is whether plaintiff remained a "participant" in the plan within the meaning of the Act at the time he sought disclosure from the committee. In the words of § 302(a)(6), was he a "former employee . . . who [was] or [might] become eligible to receive a benefit of any type . . . or whose beneficiaries [might] be eligible . . ."? We think not.

The critical fact in our view is the committee's prior final notice of April 20, which plaintiff acknowledged at his deposition. We simply do not have a case in which plan administrators waited until after receipt of a request for disclosure to notify the employee of ineligibility. Such a case might present different considerations, but we need not speculate about them here. The committee's notice of April 20, 1970, together with plaintiff's inability to make an issue over the sixty day–five day amendment of 1958, lead us to the inescapable conclusion that the district court erred in awarding any statutory penalty. Since we base reversal on this ground, we pretermit discussion of whether we would require a showing of prejudice, and if so how much, as prerequisite to a penalty award.

## V. ATTORNEY'S FEES

■ The court below denied plaintiff's prayer for attorney's fees. We affirm on the basis of this Circuit's rule that "attorneys' fees will not be awarded against a party who has defended successfully." Sapp v. Renfroe, 5th Cir. 1975, 511 F.2d 172, at 178. We see no rational distinction to be drawn between a party who defends successfully at trial and one who is forced to appeal, except that in the latter instance denial of at-

torney's fees to the victor below would seem all the more appropriate.

## VI. CONCLUSION

We have carefully examined all other contentions and find them to be without merit. The portions of the district court's judgment discussed in Parts II and V, *supra*, are affirmed. The portions discussed in Parts III and IV are reversed, and judgment is rendered in favor of Kentile Floors, Inc., et al., defendant-appellant-cross appellee, as to those portions. The costs of this appeal shall be borne by Patrick Edwin Golden, Jr., plaintiff-appellee-cross appellant.