**Jay K. GRONLUND, Plaintiff,**

v.

**CHURCH & DWIGHT CO., INC., Defendant.**

No. 80 Civ. 0953.

United States District Court, S. D. New York.

May 29, 1981.

Lovejoy, Wasson & Lundgren & Ashton, P. C., New York City, for plaintiff; Douglas Foster, Stephen R. Sugrue, New York City, of counsel.

Shea & Gould, New York City, for defendant; John B. Grant, Jr., New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

On March 25, 1981 the jury delivered a verdict in favor of the plaintiff on the two claims submitted to it for determination: (1) that he should recover $10,335. covering twelve (12) weeks severance pay under a contract of employment entered into between the parties; (2) that plaintiff is entitled to $11,200. as a bonus for 1979.

We have now before us defendant's motion for judgment notwithstanding the verdict and alternatively for a new trial. The defendant's position is: (1) that plaintiff fraudulently concealed a vital truth which amounts to legal or equitable fraud and so renders null and void the claim for severance pay; (2) that plaintiff is not entitled to a bonus for the simple reason that his arrangement with his employer did not give him a vested, contractual right to payment of a bonus. For his part, the plaintiff insists that the total trial record and the law applicable thereto firmly supports the jury's verdict.

## THE FACTS

Plaintiff commenced his services as product manager with defendant Church & Dwight Co., Inc. ("C&D") in the business of manufacturing baking soda, laundry detergent and oven cleaner in December, 1975; his employment there was terminated on December 20, 1979. In due course, he was promoted to business group manager, a position which entailed considerable discretion. He appears to have fulfilled his duties there with a conscientious approach to the challenges his assignments presented, coupled with an enthusiasm and concern that his efforts prove productive.

It was not contested at trial that in April, 1979 defendant experienced serious financial problems which caused it to adopt drastic changes in personnel and diversify its products. Included in its attempt to revi-

talize its business program was the elimination of the position of business group manager then held by plaintiff. And so it came to pass that in April, 1979 Mr. Robert A. Davies ("Davies"—"Davis" in trial transcript), then one of defendant's top executives, broke the sad news to plaintiff who testified:[1]

He said he was sorry this had to happen, but it was for the good of the company, this reorganization was right for the company. He felt that I had done a good job and I was a capable young man, I should not have any problem getting another job.... He would like me to continue working until the end of the year and at the same time look for a new job, and once I do find a job, I would have 12 weeks' severance plus my unused vacation, and, in addition, depending on my performance, I would be eligible for the incentive compensation bonus.

The vacation pay issue and the 1978 bonus issue were disposed of by the parties and were eliminated from consideration at trial. Davies emphatically denied (in his trial testimony) plaintiff's assertions of their conference in April, 1979.

From time to time, plaintiff informed Davies of his efforts to secure other employment and was cheered on by him. Fairness prompts the comment that from April to December, 1979 Davies demonstrated sympathy and concern about plaintiff's personal problems and obligations of family.

In October and November, 1979 plaintiff suggested to Davies that he be allowed to continue work on a special project beyond the close of 1979. Plaintiff testified Davies responded,[2] "You have to be terminated by the end of the year. However, you would still be getting your severance at that date." Plaintiff continued his search and from time to time voluntarily commented to his superiors on the progress of his efforts, including his first interview with Joseph E. Seagram & Sons, Inc. ("Seagram") in late October, 1979. It was the circumstances

surrounding acceptance of the Seagram offer of employment in early December, 1979 that caused the rift between these litigants and the denial by defendant of plaintiff's claims for severance pay and a bonus for 1979.

On Thursday, December 6, 1979, at a conference between Davies and plaintiff, the former handed plaintiff a letter dated November 27, 1979 addressed to plaintiff and signed by Davies as Vice President and General Manager. It was received in evidence and marked plaintiff's exhibit 1. The only portions relevant to the issues with which this litigation is concerned read: "At this time, I would like to review the joint understanding regarding your separation from the Company. Your services will no longer be required after December 31, 1979; therefore your active employment and regular employee benefits will terminate on that date. You are then entitled to eight weeks of unused vacation, four for 1978 and four for 1979. You are then eligible for twelve weeks of severance pay at your base salary. Although you are eligible for participation in the 1979 Incentive Compensation program, Company and individual performance targets must be achieved.... I have included one copy of this letter for your files. I would like you to sign the original when you have read and understood the details contained herein and return it to me in the envelope provided...."

On the same day (December 6) plaintiff wrote Davies (on the second page of that letter): "12/6/79 Bob—I understand and agree with all the details of this letter. As discussed today I would be receiving these severance (12 weeks) and vacation (8 weeks) payments, plus the basic medical and insurance benefits until May 19, 1980, starting the *day after* my separation from active employment—January 1, 1980.... Jay K. Gronlund." (pertinent portions only)

There is no contest that on December 6, 1979 plaintiff saw defendant's letter (dated November 27, 1979), plaintiff's exhibit 1, for the first time. He testified that when Dav-

---

**1.** Trial Transcript (hereinafter "T.T.") p. 23.

**2.** T.T. p. 26.

ies handed it to him, Davies "outlined verbally what it consisted of. He said it had twelve weeks of severance, plus the eight weeks of unused vacation. He mentioned that I would be eligible for a bonus. He, in fact, said I had done an outstanding job in the Super Washing Soda, so he would try to get me a good bonus. And that was it." [3] On cross-examination defense counsel put to plaintiff the question: [3a]

> ... Were the terms of that understanding as set forth in the letter consistent with your understanding of your severance arrangements with Mr. [Davies] and C&D?
>
> A. Yes, it was identical to the agreement that we reached in April, 1979, and also that we discussed in early November 1979.

After several interviews with Seagram, which plaintiff testified he mentioned to his immediate superior, Staniar, and to Davies, plaintiff on Wednesday, December 5, 1979 at a conference received from Seagram's personnel manager an oral offer of employment, repeated to him on the telephone by Seagram's president on Friday, December 7th. Plaintiff testified "... he [the president] said he has sent a letter that will formalize the whole offer, that it was in the post." [4]

No proof was adduced to contest plaintiff's repeated assertion that during his conversation with Seagram's personnel manager, he had insisted upon a written confirmation of the oral offer; that at all times he regarded such a writing as imperative to a formal and completed contract. "I said at the outset that I wanted something in writing to be a formal offer." [5]

His best recollection was that he received the confirmation letter on Friday, December 7th, and showed it to Davies the following Monday or Tuesday. He testified: "And I explained to him [Davies] that it was purely coincidental, because I was not a

hundred percent sure that I had the offer when I last talked to him, and I even showed him this letter which gave me the formal offer, which was postmarked, I think, December 6 or December 7, and there is no way that I could have received it when I last saw [Davies]. And he said, 'Well, anyway, good luck.... There's not much we can do about it....' And he said he wished me well and hoped everything works out...." [6]

It was conceded at trial that on Thursday, December 6th plaintiff made no reference whatever to the Seagram oral offer the day before. Defendant insists that such a failure on plaintiff's part is tantamount to withholding an essential truth; that had Davies been told of the December 5 Seagram oral offer, plaintiff's letter (Exhibit 1) would not have been given to plaintiff on December 6th.

\* \* \* \* \* \*

In addition to what we have disclosed above with respect to the bonus, we now undertake to make mention of other points on that subject. On occasion at trial, plaintiff referred to the promise made to him of a bonus in this fashion: "I would be eligible for my bonus." [7] He still insists that defendant definitely obligated itself to pay him a bonus come what may; that it was a vested, contractual right to which he was unconditionally entitled. Yet at trial he admitted receiving in January, 1979 an outline of defendant's incentive compensation program for 1979 (B in evidence) which he read. It included: "This company reserves the right to alter, suspend or cancel the program at any time." And at trial (cross-examination): "Q. And you knew that the Company had reserved the right to alter or otherwise cancel the program, didn't you? A. From this, yes. Q. You knew then that the program was not an automatic

---

**3.** T.T. p. 33; 34, 35.

**3a.** T.T. p. 33; 34, 35.

**4.** T.T. p. 41.

**5.** T.T. p. 92; p. 46, 47.

**6.** T.T. p. 92; p. 46, 47.

**7.** T.T. pp. 13, 58.

**1308**

payment [to] employees, didn't you? A. Taken literally, yes."[8]

Further, plaintiff also gave this unequivocal testimony [8a] (on cross-examination):

"Q. Mr. Gronlund, you understood, didn't you, that the Incentive Compensation program was not an automatic payment to employees upon the giving of a certain rating to an employee?

A. No, not exactly.

Q. Well, didn't you understand that there was a Management Review Committee that made the final decision on Incentive Compensation?

A. Yes, I understood that.

\* \* \* \* \* \*

Q. *You knew in 1979 that the Incentive Compensation that Plaintiff's Exhibit 1, the letter of November 27, talks about was subject to this Management Committee's decision, didn't you?*

A. *Yes.*

Q. *And, in fact, you knew that it said although you were eligible for participation in the 1979 Incentive Compensation program, that that said eligibility, rather than that you would automatically get it; isn't that right?*

A. *Yes, by the clear definition.*

Q. And, in fact, you were considered for the 1979 Incentive Compensation, weren't you?

A. Yes.

Q. They decided to turn you down and give you any; isn't that right? You didn't get any, did you? ... [for 1979]

A. I didn't get incentive compensation."[9] (Emphasis supplied)

## THE APPLICABLE LAW

A. *Severance Pay*

In this diversity action, where concededly New Jersey law applies, the doctrines of

legal and equitable fraud (with which defendant charges plaintiff) are clear. "Legal fraud consists of a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity, with the intention that the other party rely on it, and he does so to his damage." *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 N.J. 384, 164 A.2d 785, 789 (N.J.A.D. 1960); See also *Foont-Freedenfeld Corp. v. Electro-Protective Corp.*, 126 N.J.Super. 254, 314 A.2d 68, 71 (N.J.Sup.Ct.1974); *Schlesinger v. Wilson*, 22 N.J. 576, 127 A.2d 13 (1956); *Lopez v. Swyer*, 115 N.J.Super. 237, 279 A.2d 116 (N.J.A.D.1971), aff'd 62 N.J. 267, 300 A.2d 563 (1973).

"Fraud in ... equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.... [As here,] [t]he fact that no affirmative misrepresentation of a material fact has been made does not bar relief. The suppression of truth, the withholding of the truth when it should be disclosed, is equivalent to the expression of falsehood. *Costello v. Porzelt*, 116 N.J.Super. 380, 383, 282 A.2d 432 (Ch.Div.1971). The question under those circumstances is whether the failure to volunteer disclosure of certain facts amounts to fraudulent concealment, or, more specifically, whether [Gronlund] is bound in conscience and duty to recognize that the facts so concealed are significant and material and are facts in respect to which he cannot innocently be silent. Where the circumstances warrant the conclusion that he is so bound and has such a duty, equity will provide relief." *Jewish Center of Sussex v. Whale*, 165 N.J. 84, 397 A.2d 712, 714 (N.J.Cy.1978), aff'd, 172 N.J. Super. 165, 411 A.2d 475, 477–78 (N.J.A.D. 1980) (per curiam) (quoting *Nicholson v. Janeway*, 16 N.J.Eq. 285, 287 (1863) and *Howard v. West Jersey and Seashore R.R.*

---

**8.** T.T. pp. 73, 74; 71, 72.

**8a.** T.T. pp. 73, 74; 71, 72.

**9.** T.T. p. 72.

Co., 102 N.J.Eq. 517, 141 A. 755, 757 (1928), aff'd, 104 N.J.Eq. 201, 144 A. 919 (1928)).

While clear and extensive was the evidence adduced under the doctrines of legal and/or equitable fraud, the jury evidently was not persuaded thereby and preferred to accept plaintiff's explanation to the effect that he only regarded as final, and awaited, written confirmation of the oral understanding with Seagram (the jury was guided possibly to some extent by the old caution "there's many a slip between cup and lip"); that when the letter of confirmation arrived a day or two after plaintiff signed Exhibit 1, he promptly conveyed the information to Davies, defendant's authorized representative—a fact not in dispute.

■ We cannot abstain from commenting that it would have been only fair and proper had plaintiff revealed to defendant the oral arrangement with Seagram. This omission however does not spell out legal or equitable fraud. After all, from April, 1979 until Exhibit 1 was signed by the parties the following November, defendant was well aware, and actually encouraged, plaintiff in his search for other employment. If, as and when he succeeded, the defendant definitely promised to pay plaintiff twelve (12) weeks terminal pay.

It should be observed that no provision had been made with respect to the time period between cessation of his duties at C&D and the commencement of a new undertaking elsewhere if that came to pass. As we see it, if during that period plaintiff had a favorable employment opportunity which provided he start performance thereunder in a week, he would have been well within his rights to accept the offer without forfeiting, in whole or part, the full terminal pay provided under the terms of the oral agreement entered into by the litigants in mid-April 1979.

Because there was proof in the total trial record from which the jury could have regarded as convincing, conclusive and binding that an oral contract between these litigants was entered into in mid-April, 1979; that the letter of November 27, 1979 (plaintiff's Exhibit 1) was in essence a con-firmation thereof and only came into existence when defendant entered upon a new phase of its operations and when plaintiff sought to continue the employer-employee relationship after the close of 1979—all at a time when relations between the parties was particularly strained—we are unwilling to assign any error to the jury's estimate of the proof adduced on the legal or equitable fraud issue. While of no legal significance whatever, we observe that within minutes after the jury's sole request (following considerable deliberative time) that Gronlund's and Davies' testimony concerning the mid-April, 1979 meeting be read to them, the jury rendered its verdict.

■ Included in movant's attack on the severance pay issue (as well as the 1979 bonus issue) is the contention that each lacks legal consideration. This misconstrues the applicable law.

The fallacy ... is the assumption therein that the company's offer was susceptible of acceptance only by the rendition of a promise or undertaking by the employee in exchange, i. e., that it contemplated the consummation of a bilateral contract. Its natural construction, however, is the submission of an offer in return for rendition of services in employment by the employee until the occurrence of the condition stipulated—[here, Gronlund's finding a new job or the end of 1979]—a unilateral contract. This is the general present-day construction of employment stipulations for severance pay, bonuses or similar incentive plans. *Chinn v. China National Aviation Corporation*, 138 Cal.App.2d 98, 291 P.2d 91 (D.Ct.App.1955); *Hunter v. Sparling*, 87 Cal.App.2d 711, 197 P.2d 807 (D.Ct.App. 1948); *Bullock v. Sterling Drug*, 93 F.Supp. 371 (D.C.E.D.Pa.1950), affirmed 187 F.2d 145 (3 Cir. 1951); *Roberts v. Mays Mills*, 184 N.C. 406, 114 S.E. 530, 28 A.L.R. 338 (Sup.Ct.1922); *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 53 S.E.2d 804 (Sup.Ct.1949); *Cain v. Allen Electric etc. Company*, 346 Mich. 568, 78 N.W.2d 296 (Sup.Ct.1956); *Schofield v. Zion's Co-op Mercantile Institution*, 85

Utah 281, 39 P.2d 342, 96 A.L.R. 1083 (Sup.Ct.1934). Thus, [by] ... remaining in the employ of the defendant until the occurrence of the stipulation for severance pay matured the contractual obligation of the employer incepted by the proposal [plaintiff satisfied the requisite of consideration] .... See 1 Corbin on Contracts (1950), § 65, pp. 203, 204, § 70, p. 221. Cf. *Byerly v. Duke Power Co.*, 217 F.2d 803 (4 Cir. 1954). [This is not a case] [w]here all the services have already been rendered by the employee and he is at retirement age [and] a promise to pay him benefits is unenforceable as no longer being susceptible of acceptance by the rendition of further services until the stipulated event. See *Dolan v. Heller Bros. Co.*, 30 N.J.Super. 440, 104 A.2d 860 (Ch.Div.1954). ...

[Unconvincing is the contention] that the employer received no benefit from the employees in return for the promise sued on. Many courts have recognized that, like other of the so-called 'fringe benefits,' the availability of severance pay tends to better employee morale, improve performance and lessen turnover, all to the distinct advantage of the employer. *Chinn v. China National Aviation Corporation*, supra (291 P.2d at page 92); *Cain v. Allen Electric etc. Company*, supra (78 N.W.2d at page 299). Our Supreme Court has said that severance pay '[i]n a real sense * * * is remuneration for the service rendered during the period covered by the agreement,' *Owens v. Press Publishing Co.*, 20 N.J. 537, 546, 120 A.2d 442, 446 (1956); and see *Adams v. Jersey Central Power & Light Co.*, supra (21 N.J. [8] at page 15, 120 A.2d [737] at page 741). Nor is it accurate to regard the benefit thus derived by the employer as not having been contributed by the employees. ... It is presumed that the employer's objectives were realized and that the services of all the employees, collectively, contributed thereto. There was, therefore, both benefit to the employer and detriment to the employees. But either alone would have been sufficient if intended by the promisor as the

price of his agreement. *Joseph Lande & Son, Inc., v. Wellsco Realty, Inc.*, 131 N.J.L. 191, 198, 34 A.2d 418 (E. & A. 1943). *Anthony v. Jersey Central Power & Light Co.*, 51 N.J.Super. 139, 143 A.2d 762, 764–65 (N.J.A.D.1958).

The simple fact is that Gronlund concededly worked for movant until almost the close of 1979.

Accordingly, we cannot and do not find any error in the jury's implicit finding that sufficient legal consideration existed to support this contract for severance pay. See Generally *Textile Workers v. Paris Fabric Mills*, 22 N.J. 381, 92 A.2d 40, 41 (N.J.A.D. 1952); *Friedman v. Tappan Development*, 22 N.J. 523, 126 A.2d 646, 651–52 (N.J.Sup. Ct.1956); *Owens v. Press Publishing Co.*, 20 N.J. 537, 120 A.2d 442, 446–47 (N.J.Sup.Ct. 1956); *Stopford v. Boonton Molding Co.*, 56 N.J. 169, 265 A.2d 657, 664–65 (N.J.Sup.Ct. 1970).

### B. *Bonus for 1979*

■ Although performance target achievements and "doing a good job" are viewed by Gronlund as conditions precedent to a vested, contractual right to a 1979 bonus, the evidence adduced at trial did not support his insistance that he had such a conclusive right thereto.

We find misplaced Gronlund's reference to case law contained in his memoranda in opposition to the instant application. In *Fuller Co. v. Brown*, 15 F.2d 672 (4th Cir. 1926) ("*Fuller*"), the plaintiff received six separate and distinct partial payments of a bonus. Defendant reneged on the balance thereof (along with other bonus payments). The fact that the bonus system there (including the discretionary right of defendant not to pay any bonus) is clearly distinguishable from what confronts us here; certainly movant's contention of similarity is not persuasive enough for us to abandon the factual reality hereinabove recited.

Additionally, *Fuller's* progeny makes clear that *Fuller* has been largely interpreted to stand for the proposition that continued service by an employee (who can quit

his job at any time) is sufficient consideration for contractual entitlement to a previously promised bonus. *Armand v. Huegel*, 49 F.2d 140 (8th Cir. 1931) (continued solicitation by a salesman is sufficient consideration for a 5% bonus-commission); *The Leonidas*, 32 F.Supp. 738 (D.C.Md.1949) (seamen's war bonus was not a mere gratuity for services by these seamen performed in a war zone but not wages within the meaning of the Seamen's Act); *Lakos v. Leonidas*, 116 F.2d 440 (4th Cir. 1940) (seamen's war bonus is additional wages for extra hazardous services and is wages within the meaning of the Seamen's Act); *In Re Missouri Railroad*, 49 F.Supp. 405 (E.D.Mo.1945) (voluntary non-contributing, discretionary pension plan creates no vested right for employee who was determined ineligible); *Stevens v. Howard*, 181 F.2d 390 (4th Cir. 1950) (where a corporation relying on representations made by potential lessee purchased land for lessee to rent, lessee could not rely on its own failure to comply with the terms of the agreement); *North America [Graphite Corp.] v. Allan*, 184 F.2d 387 (D.C.CA. 1950) (employee did not have to elect between *quantum meruit* and breach of contract theories before the case went to the jury); *Byerly v. Duke Power*, 217 F.2d 803 (4th Cir. 1954) (Parker, C. J.? dissenting) (continued services for promise of a bonus is sufficient consideration); *Borden v. Skinner Co.*, 21 Conn.Sup. 184, 150 A.2d 607 (Super. Ct.1958) (a bonus is not a gift or gratuity, but a sum paid for services in addition to or in excess of that which would ordinarily be given); *Molburg v. Hunter Hosiery*, 102 N.H. 422, 158 A.2d 288 (N.H.Sup.Ct.1960) (terminated employee not eligible under terms of the profit-sharing plan); *Rochester Corp. v. Rochester*, 450 F.2d 118 (4th Cir. 1971) (unilateral offer by the employer of certain pension rights is accepted by rendering services for 10 years or more).

Equally inapposite on the bonus issue are the other cases relied on by Gronlund. *Kerbaugh v. Gray*, 212 F. 716 (2d Cir. 1914) involved a situation where an alleged promise for a bonus was defended on grounds of *nudum pactum* and the court found that consideration existed in the services the employee rendered.

*Willoughby Camera v. Commissioner of IRS*, 125 F.2d 607 (2d Cir. 1942) involved an employer's attempt to prove to the I.R.S. that even though the bonus offered to its employees as a condition of employment was not fixed in amount, the employer's total expense was deductible from gross income. Vital is the fact that the employer admitted that the employees had a contractual right to a bonus.

Finally, *Samara v. John Mee, Inc.*, 102 Misc.2d 132, 422 N.Y.S.2d 582 (1979) represents the situation where a letter advising the plaintiff that "[he] will be receiving a Christmas bonus ... for all [prior] efforts expended ..." withstood the lack of consideration attack by the employer. Here, the situation is even clearer for the employee because under the law of New York, past consideration i. e. past services, is sufficient to support a writing of this type. See N.Y. Gen.Oblig.Law § 5–1105 (McKinney)

Interestingly, in factual situations such as the case at bar, the law of New York and New Jersey are in harmony and the same result ensues. See *Alford v. Cook*, 107 N.Y.S. 710 (App.1907); *Knapp et al. v. Atlantic Basin*, 116 N.Y.S.2d 456 (Mun.Ct.N.Y. 1952); *Kristt v. Haire*, 155 N.Y.S.2d 362 (Sup.1956); *In Re Pfitzner*, 27 Misc.2d 715, 208 N.Y.S.2d 103 (1960); 36 N.Y.Jur., Master and Servant § 45.

This is not a situation where the employing company had previously developed a definite and fixed contractual yearly bonus for its employees as evidenced by a trust indenture agreement or a profit-sharing contract. E. g. *Russel v. Princeton Laboratories, Inc.*, 50 N.J. 30, 231 A.2d 800 (1967); *Hainline v. General Motors Corp.*, 444 F.2d 1250 (6th Cir. 1971).

The reality of the corporate situation here was that movant had developed a discretionary incentive program of bonuses to reward its employees for past services and provide an incentive for future performance (Defendant's Exhibit B in evidence). Clearly thereunder, no employee had a vested and clearly apparent right to a bonus. Id.

In fact, Gronlund himself recognized this on cross-examination. See Tr. p. 77, lines 12–25; p. 78, lines 1–9 (quoted hereinabove). Therefore, any language used to refer to a bonus under this scheme was an acknowledgment of the right to be considered for a bonus, certainly not a contractual right.

We adopt the reasoning found in *In Re Missouri Pac. R. Co.*, 49 F.Supp. 405, 405–06 (E.D.Mo.1943) (Moore, J.) ". . . no contribution was exacted from the employees who were to benefit from the pension plan, but operation of the plan was to be carried out in accordance with certain rules . . . each pension application was to be passed upon by the Board of Pensions which was to determine the eligibility of employees to receive pension allowance. The action of the Board was to be final and conclusive . . . no showing that the decision of the Board was unreasonable, arbitrary, unfair or capricious . . . . On the contrary, the record indicates several reasons which may have been the basis of the Board's conclusions."

The law of New Jersey is clear and we believe was properly charged: Where ". . . under the terms of the plan the committee administering it retained the absolute discretion to grant or withhold the bonus . . . [and] if the employer had refused to award the bonus, [respondent's] entitlement to the sum in question would depend upon the circumstances. While the committee administering the plan may not act arbitrarily, [citations omitted] that fact does not compel the conclusion that [respondent] here had a vested right to the bonus since the purpose of the management incentive plan was to reward an employee for outstanding work, and not to entitle him to a bonus as a matter of right." *In re Gregoriou*, 153 N.J.Super. 44, 378 A.2d 1168, 1168–69 (1977). See also *Russel v. Princeton Laboratories Inc.*, 50 N.J. 30, 231 A.2d 800 (N.J.Sup.Ct., 1967); *Dolan v. Heller Bros. Co.*, 30 N.J.Super. 440, 104 A.2d 860 (1954); 43 A.L.R.3d 503, 531–32 (1972).

Therefore, "[t]he burden [was] on the plaintiff [Gronlund,] to show that . . . [movant's] ruling was motivated by bad faith or fraud or the result of arbitrary action. [Nothing whatsoever is a part of this total trial record.] *Bradford v. New York Times Co.*, 501 F.2d 51, 61 (2 Cir. 1974); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 847 (5 Cir. 1975); *Menke v. Thompson, supra.* See *Gitelson v. DuPont*, 17 N.Y.2d 46, 49, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966); *Bruner v. Mercantile National Bank*, 455 S.W.2d 323, 328 (Tex. Civ.App.1970); *Amicone v. Kennecott Copper Corp.*, 19 Utah 2d 297, 431 P.2d 130 (1967)." *Wyper v. Providence Washington Ins. Co.*, 533 F.2d 57, 62 (2d Cir. 1976); *Russel, supra; Dolan, supra.*

Viewing the evidence in the light most favorable to Gronlund, it is ". . . so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against [movant]." *Bernardini v. Rederi A/B Saturnus*, 512 F.2d 660, 662 (2d Cir. 1975). It is abundantly clear that the vast weight of the evidence established that movant reserved the right to pay or not pay bonuses—all of which plaintiff well knew in April, 1979 and repeated thereafter. See "FACTS" *supra.*

Inasmuch as Gronlund concededly was considered for a bonus in 1979 and the evidence adduced at trial leaves uncontraverted the fact that the denial of the 1979 bonus was not in any way arbitrary, unreasonable, unfair or capricious, we hold as a matter of New Jersey law that Gronlund was not entitled to a bonus for 1979.

Accordingly, we are constrained to, and hereby do, grant only the motion for judgment n. o. v. on the 1979 bonus issue and deny the remainder of the application in all respects.

The Clerk of Court is directed to vacate the stay of execution heretofore granted, and enter judgment in favor of Gronlund in the amount of $10,335.

SO ORDERED.